**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| WILLIAM H. RICHARD,<br><br>Plaintiff,<br><br>v.<br><br>JOHN R. BALDWIN, Director of the Illinois Department of Corrections, RANDY PFISTER, Warden, RICARDO TEJEDA, Assistant Warden,<br><br>Defendants. | No. 17 C 4677<br><br>Hon. Judge Thomas M. Durkin<br><br>Hon. Mag. Judge Jeffrey Cole |

# PLAINTIFF'S RESPONSE TO DEFENDANTS' LR 56.1(A)(3) STATEMENT OF MATERIAL FACTS

## PARTIES

1. William Richard (M52774) ("Plaintiff"), is an inmate in the custody of the Illinois Department of Corrections ("IDOC") and currently housed at Dixon Correctional Center. ECF Dkt. No. 95 at ¶ 5.

**Plaintiff's Response:** Admit.

2. Defendant Rob Jeffreys is the acting director of IDOC, and is substituted in place of former acting director John Baldwin, pursuant to Federal Rule of Civil Procedure 25(d). Defendant Jeffreys is sued in his official and individual capacity. ECF Dkt. No. 95 at ¶ 6.

**Plaintiff's Response:** Admit.

3. Defendant Randy Pfister was the Warden of Stateville Correctional Center ("Stateville") and oversaw the Northern Reception and Classification Center ("NRC") from November 2015 to the time Plaintiff was transferred on June 1, 2016. Defendant Pfister is sued in his individual capacity. ECF Dkt. No. 95 at ¶ 7.

**Plaintiff's Response:** Admit.

4. Defendant Ricardo Tejeda was the Assistant Warden of Operations for Stateville Correctional Center and oversaw the NRC. Defendant Tejeda is sued in his individual capacity. ECF Dkt. No. 95 at ¶ 8.

**Plaintiff's Response:** Admit.

## JURISDICTION AND VENUE

5. Subject matter jurisdiction was conferred upon this Court by 28 U.S.C. § 1331 and § 1343(a)(3). Jurisdiction is not disputed. ECF Dkt. No. 95 at ¶ 3.

**Plaintiff's Response:** Admit.

6. Venue is appropriate pursuant to 28 U.S.C. 1391(b)(2) because the allegations contained in Plaintiff's Second Amended Complaint occurred while he was in the custody of the IDOC at Northern Reception and Classification Center in Crest Hill, Illinois, which lies within the venue of the United States District Court for the Northern District of Illinois, Eastern Division. Venue is not disputed. ECF Dkt. No. 95 at ¶ 4.

**Plaintiff's Response:** Admit.

## UNDISPUTED MATERIAL FACTS

### *Involved Entities*

1. The placement, medical evaluation, security classification, and transfer of inmates within the IDOC involves various entities, organizations, and contractors. Ex. 5 at 15:5-18:6; Ex. 6 at 21:13-24, 22:1-24, 125:23-24, 126-128:1-15.

**Plaintiff's Response:** Deny that any entities and organizations other than IDOC, through its employees and its contractor, are involved in the placement, medical evaluation, security classification, and transfer of inmates, as unsupported by the record cited. Deny the

reference to IDOC's contractor, or any role of the contractor in placement, security classification, and transfer as unsupported by record. Admit that screening process at the NRC includes both a medical evaluation and clinical staff (Def. Ex. 5 at 17:6–18:2); that the Transfer Coordinator's office includes multiple staff including two that work on classifications from the NRC (*Id.* at 15-16); admit that transfers from the NRC required "data input" from the record office, medical, clinical services, mental health, OTS, and ARCS; and that both clinical services and security are involved in facilitating transfers, (Def. Ex. 6 at 21:13-22:24, 125:23-128:15).

2. Healthcare and medical services are provided by IDOC's healthcare contractor, Wexford Health Sources, Inc. ("Wexford"). Ex. 4 at 71:14-25, 72:1-7; Ex. 6 at 124:4-12.

**Plaintiff's Response:** Admit.

3. Inmate medical care is provided by Wexford subject to Wexford's policies and guidelines for treating its patients. Ex. 4 at 71:14-25, 72:1-7.

**Plaintiff's Response:** Admit.

4. Internal placement of an inmate within a facility and ADA accommodations for that facility are provided by the facilities' ADA coordinator. Ex. 5 at 39:13-16; Ex. 6 at 111:8- 24, 112:1-8; Ex. 7 at 36:16-25.

**Plaintiff's Response:** Admit that issues around ADA accommodations in facilities are addressed by the ADA Coordinator. Deny the remaining paragraph as follows: Deny that placement of an inmate within a facility is provided by the facility's ADA coordinator. *See* Def. Ex. 6, Juan Tellez, at 25:11–26:2 (internal placement within a facility is determined by the assistant warden of programs); 29:15–30:13 (medical recommendations about where to house prisoner within facility would be "addressed" by security staff); Def. Ex. 7, Tracy

Engleson at 14:5–18, 19:10–24 (medical doctor could recommend infirmary placement if prisoner had an appropriate medical condition.) The cited testimony does not support the statement. Def. Ex. 5 at 39:13-16 (housing at the facility is decided by the facility internally without the involvement of the transfer coordinator); Def. Ex. 6 at 111:8- 24, 112:1-8 (ADA issues and grievances go to the facility's ADA Coordinator or, if none, then through the grievance process); Def. Ex. 7 at 36:16-25 (NRC had both an ADA Coordinator and a healthcare administrator on staff at the time).

5. The Office of Health Services is in charge of finding infirmary bed placements throughout IDOC facilities for qualifying inmates. Ex. 5 at 25:9-24, 26:1-20.

**Plaintiff's Response:** Admit.

6. The transfer coordinator's office is a division of IDOC in Springfield, Illinois that is tasked with monitoring and approving the movement and transportation of all inmates. Ex. 5 at 12:6-14, 15:5-18, 16:7-23.

**Plaintiff's Response:** Admit that the office oversees movement of inmates from facility to facility (and not movement in general) and transfer between facilities. Def. Ex. 5, Doug Stephens, at 12:6-21. Deny that the office is tasked with transportation of inmates as unsupported by the record. Def. Ex. 5 at 12:6-14, 15:5–18, 16:7–23.

7. An inmate with serious medical needs cannot be transferred to another facility without the approval of the office of health services and the transfer coordinator's office. *See* Def. Ex. 5 at 12:6-14, 15:5-18, 16:7-23, 25:9-24, 26:1-20; 102:8-24.

**Plaintiff's Response:** Admit.

***The Northern Reception and Classification Center ("NRC")***

8. The NRC is a prison facility tasked with initially receiving, classifying, and transferring inmates to other institutions. Ex. 5 at 17:6-24, 18:1-2; Ex. 6 at 21:13-24, 22:1-24, 125:23-24, 126-128:1-15; *see also* Ex. 11.

**Plaintiff's Response:** Admit.

9. Although located in Crest Hill, Illinois, and adjacent to Stateville Correctional Center, the NRC functions as a separate and distinct prison facility from Stateville. *See* Ex. 2 at 8:2-8.

**Plaintiff's Response:** Admit that NRC and Stateville are adjacent buildings located in Crest Hill, Illinois. Deny that the NRC functions as a separate and distinct from Stateville. See Def. Ex. 2 at 8:2-8 (asked whether Stateville proper and NRC are considered a single facility, Warden Pfister responded "depends on who you talk to. I consider it because you have one warden that oversees both of them.").

10. Although intended to be a temporary holding facility, the NRC is equipped to provide medical care, provide meals, and showers. Ex. 2 at 9-11; *see also* Ex's. 12-13.

**Plaintiff's Response:** Admit that the NRC is intended to be a temporary holding facility and that it is equipped to provide meals and showers. Deny that the NRC was "equipped to provide medical care." See Def. Ex. 2, Randy Pfister, 62:16-18 ("NRC is not specially equipped to be a medical facility"); 110:2-11 (NRC is not the best placement for an inmate with significant chronic medical needs); 34:19 – 35:5 (if prisoners had long-term health care needs requiring hospitalization, they would be brought "inside the walls" to Stateville infirmary); Def. Ex. 7, Tracy Engleson, 59:16-22 (NRC did not have an infirmary between June 2015 and June 2016); Def. Ex. 5, Doug Stephens 28:19 – 29:1 (NRC's long-term infirmary beds were on the Stateville

side). Object to Def. Ex. 12 as lacking foundation; it is unclear whether or how this policy for IDOC outpatient care relates to NRC.

11. From June 2015 to December 2015, Superintendent Tracy Engleson oversaw the NRC's operations, which included monitoring transportation, receiving of inmates, and the clinical services office. Ex. 7 at 6:18-25, 7:1-5, 9:11-22.

**Plaintiff's Response:** Admit in part and deny in part. Admit that Tracy Engleson served as the superintendent and oversaw the NRC's operations, which included monitoring transportation, receiving of inmates, and the clinical services office for a period of time up to December 2015. Deny that she was in this role for the entire period stated. Def. Ex. 7, Tracy Engleson, 7:2 -8 (asked whether she was superintendent of the NRC between June and December 2015, Superintendent Engleson answered, "No, I think I was MSU for a few months, and then I went back over to NRC.").

12. The NRC's clinical services office oversees the processing and classification of inmates at the NRC. Ex. 5 at 15-17; Ex. 11.

**Plaintiff's Response:** Admit. Def. Ex. 6, Juan Tellez, at 21:13 – 23:3.

13. The NRC's processing and classification process involves various sub-departments and entities within the IDOC that work together as "systems" to gather information regarding an inmate's aggression level, escape risk, and mental and medical health needs. Def. Ex. 6 at 126-130; *see also* Def. Ex. 7 at 80:7-25, 81-82, 83:1-5; Def. Ex. 11.

**Plaintiff's Response:** Admit.

14. In classifying inmates, inmates that are of old age, in a wheel chair, on oxygen, and use a walker or a cane are classified as "vulnerable" inmates that may not be able properly defend themselves in certain institutions. Ex. 6 at 132:22-24, 133:1-24, 134:1-20.

**Plaintiff's Response:** Admit that old age and use of wheelchair, oxygen, walker, or cane are factors that are considered in making a determination that an inmate is "vulnerable." Def. Ex. 6 at 133:16-134:20.

15. The clinical services offices review this information and makes a proposed classification and placement for the inmate that is reviewed by the transfer coordinator's office. *See* Ex. 5 at 16:7-24, 17:1-24, 18:1-19, 20:11-24, 21:1-13; Ex. 6 at 40:4-24, 41-42, 43:1-2; *see also* Ex. 2 at 42:6-12.

**Plaintiff's Response:** Admit.

16. In order to classify and recommend a potential placement for an inmate, the clinical services office and the transfer coordinator's office rely on the information provided to them from these various systems. *See* Ex. 5 at 104:3-24, 105:1-4; Ex.6 at 126-130, 131;1-11.

**Plaintiff's Response:** Admit.

17. If an inmate's information changes or was inputted incorrectly, the clinical services office must reclassify and propose a new placement for the inmate. *See* Ex. 5 at 104:3- 24, 105:1-4; Ex. 6 at 126-130, 131:1-11.

**Plaintiff's Response:** Admit.

18. The NRC is responsible for arranging transportation for inmates being sent to other facilities. Ex. 5 at 103:7-13.

**Plaintiff's Response:** Admit.

19. Transporting inmates required staff from both facilities to coordinate travel on days where the receiving facility had the staff to transport Plaintiff from a half-way point. Ex. 7 at 46:5-25, 47:1-7; *see also* Ex. 16 at IDOC_001398.

**Plaintiff's Response:** Deny that the transportation "requires" the two facilities to meet at a half-way point. Def. Ex. 3, Assistant Warden Tejeda, at 108 – 111 (buses ran from NRC to Lincoln, and then from Lincoln to facilities in the Southern region), but see 85:1-6 ("certainly, there have been times when [NRC staff has] transported somebody the whole way to a facility like Western."), 87: 4-9.

20. During the relevant time period, the NRC and Stateville shared one ADA van. *See* Ex. 7 at 85:6-25, 86-87, 88:1-11.

**Plaintiff's Response:** Admit.

21. The ADA van shared by both the NRC and Stateville prioritized transporting inmates with court writs and medical writs over inmates that were just scheduled for transfer to another facility. Ex. 7 at 85:6-25, 86-87, 88:1-11.

**Plaintiff's Response:** Deny that the van made the prioritization. Admit that IDOC prioritized court and medical writs over transfers in scheduling the van's use. Def. Ex. 7, Tracy Engleson, at 88.

***<u>Timeline of Events</u>***

22. Prior to entering the NRC, Plaintiff was diagnosed with asythma, emphysema, diabetes, and chronic obstructive pulmonary disease ("COPD"). ECF Dkt. No. 95 at ¶ 9.

**Plaintiff's Response:** Admit.

23. Due to these conditions, Plaintiff used a wheelchair, concentrated oxygen, and a CPAP machine. ECF Dkt. No. 95 at ¶¶ 9-11.

**Plaintiff's Response:** Admit in part, deny in part. Deny that Plaintiff used a wheelchair prior to his incarceration or during his placement at the NRC. Pl. Ex., IDOC_000005 (William Richard's initial assessment upon entry to IDOC indicates he uses cane/walker, oxygen tank, and CPAP machine); Pl. Ex. 3, Nicolette Duffield, 74:20-77:6 (discussing IDOC_000005); Def. Ex. 17, SEALED Transfer Documents, at IDOC_001078 (William Richard's Initial Classification Report). Admit the remaining paragraph.

24. Plaintiff also has significant heart disease. He had open-heart surgery in 2007 and had heart attacks in 2013 and 2014, before his incarceration. ECF Dkt. No. 95 at ¶ 10.

**Plaintiff's Response:** Admit.

25. Four days after entering the NRC, Plaintiff suffered a heart attack and was transferred to the hospital. Ex. 16 at IDOC_001263.

**Plaintiff's Response:** Deny as unsupported by the record. Admit that six days after Plaintiff entered the NRC, he was taken to an outside hospital for chest pains. Def. Ex. 16, at IDOC_001263 (page 43 of 65).

26. After being medically evaluated, processed, and classified by various systems within the NRC, the clinical services department recommended Plaintiff for placement at Western Correctional Center. Ex. 5 at 29:2-24, 30:1-24, 31:1-15; *see also* Ex. 17 at IDOC_001095-97.

**Plaintiff's Response:** Deny. Def. Ex. 5, Doug Stephens, 30:5 – 31:15; see also IDOC_001077 (Clinical Services recommended Plaintiff for placement at Dixon, Centralia,

or Robinson, but the Transfer Coordinator's office approved Mr. Richard for transfer to Western Illinois Correctional Center.).

27. On July 1, 2015, Plaintiff was confirmed for transfer by bus with other general population inmates to Western Correctional Center. *See* Ex. 5 at 39:20-24, 40:1-24, 41:1-2.

**Plaintiff's Response:** Admit.

28. On July 2, 2015, Plaintiff was informed he could not ride on the bus because he had an oxygen tank, and was thus "pulled" from the pool of inmates set to transfer. Ex. 5 at 84:5- 16; Ex. 8 at Ex. 16 at IDOC_001391.

**Plaintiff's Response:** Admit.

29. Plaintiff could not ride the bus because his disabilities could not be accommodated in case there was an emergency or a bus break down. Ex. 8 at 29:1-11.

**Plaintiff's Response:** Deny as unsupported by the evidence cited. Def. Ex. 8 at 29:1-11. See also Def. Ex. 3, Ricardo Tejeda, 113:15-24; Def. Ex. 7, Tracy Engleson, 47:17 – 48:12, 85:6-14.

30. In addition, Plaintiff could not ride the bus with an oxygen tank because it could be used as a weapon to harm staff and other inmates. Ex. 7 at 84:5-16.

**Plaintiff's Response:** Deny as unsupported by the evidence cited. Def. Ex. 7 at 84:5-16. See also Def. Ex. 3, Ricardo Tejeda, 113:15-24 (while riding the bus with an oxygen tank would be a security concern "we would accommodate" by "storing the oxygen tank within the staff's view.)

31. Following this incident, staff from NRC Security, Office of Health Services, clinical services, and the transfer coordinator's office all communicated with each other to arrange the necessary accommodations to transport Plaintiff. Ex. 16 at IDOC_1422-24.

**Plaintiff's Response:** Admit.

32. On August 10, 2015, Superintendent Engleson contacted the transfer coordinator's office in Springfield to see if Plaintiff could be transported by car. Ex. 16 at IDOC_1422-24.

**Plaintiff's Response:** Admit.

33. That same day, the transfer coordinator's office informed Superintendent Engleson that she should check with the NRC's medical staff as to whether Plaintiff could be transported by car or if he had to be transferred by ADA transport van. Ex. 16 at IDOC_1422-24.

**Plaintiff's Response:** Admit.

34. Later that day, NRC's health care unit contacted the Office of Health Services to determine whether Plaintiff could be transported by car. Ex. 16 at IDOC_1422-24.

**Plaintiff's Response:** Deny. Def. Ex. 16, IDOC_001422-24 (pages 5-7 of 65). This statement is not supported by the citation.

35. No response was heard until the matter was followed up on September 8, 2015. Ex. 16 at IDOC_1422-24.

**Plaintiff's Response:** Deny as unsupported by the citation. Def. Ex. 16, IDOC_001422-24 (pages 5-7 of 65). Admit that there is a gap in the email chain from August 10, 2015 to September 8, 2015.

36. Immediately after receiving a response, an order was placed to have Plaintiff medically evaluated. Ex. 16 at IDOC_1422-24.

**Plaintiff's Response:** Deny that the statement is supported by the citation. Def. Ex. 16 at IDOC_001422-24 (pages 5-7 of 65). Admit that on September 8, 2015, Ester Martin, Director of Nursing, responded to the email stating that: "According to the provider he can transfer. I am having him brought to the ER this morning for a condition update. And to complete his checklist." Def. Ex. 16, at IDOC_001423 (page 6 of 65); Pl. Ex. 3, Nicolette Duffield, 39:4-5 (identifying Ester Martin as the director of nursing).

37. The transfer coordinator's office also informed NRC healthcare staff to contact the office of health services to check on additional infirmary bed placements at other facilities. Ex. 16 at IDOC_1422-24, 5191, 5198, 5201.

**Plaintiff's Response:** Admit.

38. However, Plaintiff was unable to be transported because arrangements could not be made for Plaintiff to be sent to the proposed receiving facility. Ex. 16 at IDOC_005186.

**Plaintiff's Response:** Deny. Ex. 16, p. 22 of 65. This statement is not supported by the record.

39. On October 5, 2019, Defendant Tejeda had an interaction with the Plaintiff where he discussed Plaintiff's medical concerns and length of stay at the NRC. Ex. 9 at IDOC-000983- 84, Ex. 16 at IDOC_001424, 1437.

**Plaintiff's Response:** Admit. Def. Ex. 16, at IDOC_001422 (page 5 of 65).

40. That same day, Defendant Tejeda followed up on Plaintiff's transfer. Ex. 16 at IDOC_001424, 1437.

**Plaintiff's Response:** Admit. See Def. Ex. 16, at IDOC_001422 (page 5 of 65).

41. There is no record of any other communications regarding Plaintiff until he filed a grievance on December 2, 2015. *See* Ex. 16.

**Plaintiff's Response:** Deny. Def. Ex. 16, at IDOC_001395 (page 4 of 65); Pl. Ex. 10 (weekly emailed reports on prisoners at NRC over 90 days, sent from October 2, 2015 through May 27, 2016).

42. NRC Superintendent Tracy Engleson retired in December 2015. Ex. 8 at 73:21-23.

**Plaintiff's Response:** Admit.

43. On January 23, 2016, NRC staff informed the new NRC superintendent, Darrin Hunter, about Plaintiff so that he could be transferred. Ex. 8 at 73:21-25, 74:1; Ex. 16 at IDOC_001391, 1639, 1650.

**Plaintiff's Response:** Admit that on January 23, 2016, NRC staff copied the new NRC superintendent, Darrin Hunter, on an email about Plaintiff instructing the casework supervisor (Ollins) to coordinate with Superintendent Hunter regarding the transfer of Plaintiff. Def. Ex. 16, at IDOC_001639 (page 45 of 65). Deny the remainder of the statement as unsupported by the record. Def. Ex. 8 at 73:21-25, 74:1; Def. Ex. 16 at IDOC_001391, 1639, 1650 (pages 44-46 of 65).

44. Due to the length of time between Plaintiff's approval for transfer in the Fall of 2015 and the Spring of 2016, Plaintiff's approval for transfer "lapsed." Ex. 16 at IDOC_002105.

**Plaintiff's Response:** Admit. Def. Ex. 16 at IDOC_002149 (page 54 of 65).

45. Inmate classifications lapse every 90 to 120 days due to changes in inmate circumstances, medical needs, and threat levels. Ex. 7 at 70:19-24, 71:1-20.

**Plaintiff's Response:** Admit.

46. On April 6, 2019, the transfer coordinator's office and NRC clinical services sent more communications about redoing the classification process for Plaintiff. Ex. 16 at IDOC_002149.

**Plaintiff's Response:** Admit.

47. The next day, on April 8, 2016, Plaintiff was approved for transfer and placed on another transfer list. Ex. 16 at IDOC_002125-26.

**Plaintiff's Response:** Admit.

48. On April 27, 2016, the NRC health care unit followed up on Plaintiff's transfer by reaching out to the NRC's clinical services office. Ex. 16 at IDOC_002416-17.

**Plaintiff's Response:** Admit.

49. The same day, clinical services forwarded the health care unit's message regarding Plaintiff's transfer to the transfer coordinator's office. Ex. 16 at IDOC_002416-17.

**Plaintiff's Response:** Admit.

50. On May 3, 2016, the transfer coordinator's office followed up on Plaintiff's transfer with the office of health services and informed them that Plaintiff had been reclassified for Dixon's infirmary. Ex. 16 at IDOC_002416-17.

**Plaintiff's Response:** Admit.

51. On May 9, 2016, the office of health services gave the transfer coordinator's office approval to transfer Plaintiff to Dixon by car. Ex. 16 at IDOC_002416-17.

**Plaintiff's Response:** Admit.

52. On May 10, 2016, the transfer coordinator's office informed the NRC that Plaintiff's transfer to Dixon via car was approved, and that the NRC needed to make arrangements with Dixon to transfer Plaintiff. Ex. 16 at IDOC_002416-17.

**Plaintiff's Response:** Admit.

53. On May 31, 2016, NRC's clinical services office followed up again with the various entities involved in Plaintiff's transfer. Ex. 16 at IDOC_002660.

**Plaintiff's Response:** Admit.

54. On May 31, 2016, the transfer coordinator's office followed up again with the office of health services to verify whether Plaintiff was still approved for transfer to Dixon. Ex. 16 at IDOC_002660.

**Plaintiff's Response:** Admit.

55. On May 31, 2016, the NRC superintendent made arrangement for Plaintiff's transfer to Dixon. Ex. 16 at IDOC_002660.

**Plaintiff's Response:** Deny that the superintendent made the arrangements, but admit that on May 31, 2016 the NRC superintendent sent an email instructing other staff to make arrangements. Def. Ex. 16 at IDOC_002660 (page 63 of 65).

56. On June 1, 2016, Plaintiff was transferred to Dixon. *See* Ex. 16 at IDOC_002685; *see also* Ex. 14.

**Plaintiff's Response:** Admit.

***Plaintiff's Access to Programs at the NRC***

57. Plaintiff was placed in a cell reserved for inmates disabled under the ADA that was closer to electrical outlets. *See* Ex. 7 at 14:20-24, 15:1-25, 57:2-7, 88:12-19; Ex. 14.

**Plaintiff's Response:** Admit in part, deny in part. Admit that Plaintiff was placed in a cell reserved for inmates with disabilities. Deny that this cell was "closer to electrical outlets," as unsupported by the evidence cited. Def. Ex. 1, William Richard, 49:12-50:14 (explaining that there was an outlet outside his cell but "it was too far away, and they couldn't put extension cord out there...")

58. The NRC has modifications to assist disabled inmates such as beds and showers with rails, and first-floor cells. Ex. 7 at 14:20-24, 15:1-25, 57:2-7, 88:12-19.

**Plaintiff's Response:** Admit.

59. Plaintiff was able to use his oxygen tank while in his cell at the NRC. *See* ECF Dkt. No. 95 at ¶ 27.

**Plaintiff's Response:** Admit.

60. Plaintiff had access to the same programs offered to other inmates at the NRC, such as visitation privileges, phone access, commissary, yard time, and religious services. *See* Ex. 2 at 25:3-24, 26:1-24, 27:1-12; Ex. 7 at 88:20-25, 89:1-25, 90:1-24.

**Plaintiff's Response:** Admit in part, deny in part. Admit that Plaintiff had access to the same NRC programs of visitation privileges, phone access, commissary, and religious services. Deny that Plaintiff had access to the yard time provided to other inmates at NRC. Def. Ex. 1, William Richard, 67:3-7; 71:9-24.

61. Plaintiff did not leave his cell to access the yard or attend NRC programs because he did not like engaging with other inmates and was not permitted to bring his oxygen outside his cell. *See* Ex. 1 at 66:20-24; 67:3-7, 71:9-24, 72:1-16; 74:16-24, 75:5-15.

**Plaintiff's Response:** Deny as unsupported by the record. Ex. 1 at 66:20-24; 67:3-7, 71:9-24, 72:1-16; 74:16-24, 75:5-15. *See also,* Pl.'s Local Rule 56.1(b)(3) Statement of Facts ("PSOF"), ¶¶2-7, 20.

62. Plaintiff was able to speak continuously without an oxygen tank, and without issue, for at least three (3) hours. Ex. 1 at 1, 68: 3-23; 70:4-14, 137:15; *see also* Ex. 1 at 75:23- 24, 76:1-24, 77:1-20.

**Plaintiff's Response:** Admit in part and deny in part. Admit that Plaintiff was able to answer questions at his deposition without an oxygen tank for at least three hours. Ex. 1 at 1, 68: 3-23; 70:4-14. Deny that he was "without issue." Def. Ex. 1 at 70:9-18. Deny that Plaintiff spoke continuously during the deposition. *See* Def. Ex. 1.

63. Plaintiff was provided three meals a day and showers on the same basis as all other inmates. *See* Ex. 1 at 129:7-24; Ex. 2 at 25:9-11; Ex. 8 at 57:2-7.

**Plaintiff's Response:** Admit in part, deny in part. Admit that Plaintiff was provided three meals a day and that plaintiff was provided showers. Deny that meals or showers were provided on the same basis as all other inmates. Pl. Ex. 1, Wendell Venerable, 42:1 – 43:13 (NRC inmates eat all meals in cell and shower once per week, while other medium-security inmates eat meals communally in the chow hall and shower more than once per week.).

64. Plaintiff had cellmates for at least his first six months at the NRC. Ex. 1 at 72:17- 24, 72:1-19.

**Plaintiff's Response:** Admit.

***Defendants' Personal Involvement***
***Regarding Plaintiff's Conditions of Confinement and ADA Accommodations***

65. Defendant Pfister's only personal involvement in this matter is through the grievance process. Ex. 1 at 125:18-24, 126:1-6; Ex. 2 at 60:21-24, 61:1-6; Ex. 9 at IDOC_1134- 36; *see also* Ex. 9 at WR000010-11.

**Plaintiff's Response:** Deny. Def. Ex. 2, Randy Pfister, 31:6 – 32:16; 27:6-19; 30:3-9; 36:2-14; 40:10-41:18. Pl. Ex. 10, 90 Day Reports, at IDOC_002891-2893; Def. Ex. 2, Randy Pfister, 40:12-19, 41:4-18 . See also PSOF ¶¶8, 17, 37-40.

66. Defendant Pfister designated responsibility to review and respond to inmate grievances to his administrative assistants. Ex. 2 at 104:2-10.

**Plaintiff's Response:** Deny. Def. Ex. 2 at 104:2-10. This statement is not supported by the record.

67. Defendant Pfister did not personally review Plaintiff's grievances. Ex. 2 at 104:2-10.

**Plaintiff's Response:** Deny. Def. Ex. 2 at 104:2-10. This statement is not supported by the record.

68. Defendant Tejeda had an interaction with Plaintiff in October 2015 where he spoke to Plaintiff about his transfer from the NRC. Ex. 9 at IDOC-000983-84, Ex. 16 at IDOC_001424, 1437.

**Plaintiff's Response:** Admit.

69. Defendant Tejeda informed Plaintiff that he would look into Plaintiff's transfer. Ex. 1 at 48:3-24.

**Plaintiff's Response:** Admit.

70. In April 2017, Defendant Tejeda had a second interaction with the Plaintiff while he was waiting to be seen by a doctor. Ex. 1 at 59:5-24, 60:1-20.

**Plaintiff's Response:** Deny that the interaction was in April 2017. Admit that Defendant Tejeda had an interaction with the Plaintiff while he was waiting to be seen by a doctor in April 2016. Def. Ex. 1 at 59:5-24, 60:1-20.

71. Plaintiff complained to Defendant Tejeda about his medical conditions and his transfer. Ex. 1 at 59:5-24, 60:1-20.

**Plaintiff's Response:** Admit.

72. Defendant Tejeda informed Plaintiff that he would look into his transfer and deferred questions about his medical care to his doctor. Ex. 1 at 59:5-24, 60:1-20.

**Plaintiff's Response:** Admit.

***Plaintiff's Attempts to Grieve His Claims***

73. Plaintiff only filed grievances raising issues regarding his medical care and transfer. *See* Ex. 1 at 80:4-6; Ex. 9; Ex. 10; Ex. 16.

**Plaintiff's Response:** Deny the characterization that the grievances cited "only" raise issues regarding Plaintiff's medical care and transfer. Pl. Ex.14, IDOC_000983-84 (December grievance); IDOC_000979-981; Def. Ex. 1, William Richard, 113:7-117:15; Pl. Ex. 17, Counseling Summaries, at IDOC_001071 (page 13 of 13); IDOC_1394-95.

74. Plaintiff's counselor, Ruth Miller, explained to him how the grievance process worked and what he must []. Ex. 1 at 80:7-17.

**Plaintiff's Response:** Admit that Ruth Miller explained to Plaintiff how the grievance process worked.

75. Plaintiff's cellmate, Anthony, helped Plaintiff file his grievances. Ex. 1 at 73:16- 24, 74:1-10.

**Plaintiff's Response:** Admit.

76. While at the NRC, Plaintiff knew that he had to put sufficient details in his grievances (who, what, when, where, why). Def. Ex. 1 at 80:7-17; *see also* Def. Ex. 4 at 13:15-25, 14:1-13.

**Plaintiff's Response:** Plaintiff denies and objects to the characterization of "sufficient details" as unsupported and argumentative. Admit that Plaintiff's cellmate helped him "as far as how I should put it, how I should write it" and that his counselor explained "the steps I have to go through." Def. Ex. 1, William Richard, at 80:7-17; *see also id.* at 83:3-24.

77. There is no record of Plaintiff filing a grievance regarding flooding in his cell, rodent infestation, bugs, or excessive heat or cold. *See* Ex. 1 at 80:4-6; Ex. 8 at 12:5-24, 13-14; Ex. 9; Ex. 10; Ex. 16; *see also* Ex. 4 at 25:13-25; 26:1-25, 27:1-6.

**Plaintiff's Response:** Admit that the grievances produced by Defendants in this case do not make specific reference to flooding in his cell, rodent infestation, bugs, or excessive heat or cold. Deny that there is no record of other grievances filed by Plaintiff. Pl. Ex. 17, IDOC_001071 (Counseling Summaries Log demonstrating grievances filed 7/30/2015 and 10/7/2015); Pl. Ex. 11, Emails, at IDOC_001394-1395) (pages 3–4 of 18).

RESPECTFULLY SUBMITTED,

/s/ Samantha R. Reed
One of the Attorneys for Plaintiff

Amanda Antholt
Samantha Reed
Equip for Equality
20 N. Michigan Avenue, Suite 300
Chicago, Illinois 60602
(312) 341-0022
amanda@equipforequality.org
samantha@equipforequality.org