**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| WILLIAM H. RICHARD,<br><br>Plaintiff,<br><br>v.<br><br>RANDY PFISTER, Warden, JOHN R. BALDWIN, Director of the Illinois Department of Corrections, RICARDO TEJEDA, Assistant Warden,<br><br>Defendants. | No. 17 C 4677<br><br>Hon. Judge Thomas M. Durkin<br><br>Hon. Mag. Judge Jeffrey Cole |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S LR 56.1(B)(3)(C) STATEMENT OF ADDITIONAL FACTS**

Defendants, Randy Pfister, Rob Jeffreys[1], and Ricardo Tejeda by and through their counsel, Kwame Raoul, Attorney General of Illinois, responds to Plaintiff's LR 56.1(b)(3)(C) Statement of Additional Facts as follows:

**The Northern Reception Center**

1. The Stateville Northern Reception Center ("Reception Center" or "NRC") is a receiving and intake facility, where prisoners typically stay one or two weeks. Pl. Ex. 6 at ¶2 (at time of Plaintiff's incarceration at NRC, the average length of time for prisoners to stay at NRC before being transferred to assigned parent facility was one to two weeks); Pl. Ex. 7 at ¶2 (same). See also Def. Ex. 2, Pfister, 8:13–19; Def. Ex. 3, Tejeda, 14:23–15:3.

**RESPONSE**: **Undisputed.**

2. The "premise" of the Reception Center is to facilitate the transfer of the new inmate to a parent facility. Def. Ex. 3, Assistant Warden Tejeda, 112:15–16 ("That was the whole premise

[1] The operative complaint was filed against John Baldwin in his official capacity as director of the Illinois Department of Corrections ("IDOC"). Pursuant to Federal Rule of Civil Procedure 25(d), Mr. Baldwin's successor, Rob Jeffreys is automatically substituted as a party.

of the NRC to transfer you out"); Def. Ex. 6, Juan Tellez, at 30:20-23 (it "was never a place to be long-term. The NRC, as the scope of the NRC, is a temporary facility."); Pl. Ex. 1, Venerable, 25:18-26:8. A "parent" facility is a facility intended for long-term inhabitation. Def. Ex. 6, Tellez, at 17:4-7:16 (parent facilities are where prisoners are "actually doing their time"); Def. Ex. 3, Tejeda, 25:12-30:9 (describing difference between NRC and a parent facility); Pl. Ex. 5, NRC Handout.

**RESPONSE: Disputed to the extent Plaintiff's characterization suggests NRC is only appropriate for short term placements and cannot care for inmates on a long-term basis. *See* Ex. 2 at 9-11; *see also* Ex.'s 12-13.**

3. Prisoners at the Reception Center are confined to their cells 22-24 hours per day and only leave their cells for showers, medical reasons, yard, counseling programs, visits authorized by the Chief Administrative Officer, and when they are transferred to another unit or another facility. Pl. Ex. 8, Def.'s Amended Answer to Pl.'s 1st RFA ¶19; Pl. Ex. 1, Venerable, 44:16–46:5; Def. Ex. 3, Tejeda, 25:12–26:18 (at the Reception Center prisoners are "pretty much in their cell"); Pl. Ex, 9, AD 05.07.102 (restrictions on receiving-status prisoners); see also Def. Ex. 2, Pfister, 32:11–16 (agreeing that prisoners the Reception Center are in their cells more than at many other facilities).

**RESPONSE: Undisputed and immaterial. The above assertions are immaterial to the extent the facts contained in paragraph 3 have no bearing on Defendants' defenses of exhaustion, lack of personal involvement, lack of deliberate indifference, Plaintiff's conditions of confinement, and disability discrimination arguments.**

4. The cells at the Reception Center are unique among facilities in that they lack any natural light. Def. Ex. 2, Pfister, 20:20-22. The cells, and the walls that they face, do have not

windows. Id. at 19:6-24); 20:1-22; see also Pl. Ex. 1, Venerable, 39:17-22 ("When I first went to the NRC before it was populated as a tact officer, I noticed that there were no windows. The only way you would know night from day is because there was a door to the rear; and if the sun light came in, you would see the sun light on the wall.").

**RESPONSE**: **Undisputed and immaterial. The above assertions are immaterial to the extent the facts contained in paragraph 4 have no bearing on Defendants' defenses of exhaustion, lack of personal involvement, lack of deliberate indifference, Plaintiff's conditions of confinement, and disability discrimination arguments.**

5. The cells at the Reception Center have no outlets, so prisoners could not have TV or listen to radio, are smaller than general population cells, and former counselor Wendell Venerable testified that "when I first saw NRC I thought it was a seg unit … it was totally different than general pop prison." Pl. Ex. 1, Venerable, 39:23-40:21.

**RESPONSE**: **Undisputed and immaterial. The above assertions are immaterial to the extent the facts contained in paragraph 5 have no bearing on Defendants' defenses of exhaustion, lack of personal involvement, lack of deliberate indifference, Plaintiff's conditions of confinement, and disability discrimination arguments.**

6. Warden Pfister admits that housing in the Reception Center for receiving-status prisoners is much more restrictive than other general population settings in that there is no day room, gym, educational or vocational programs, or library; meals are taken in cell; they do not have televisions or radios; there is no state pay; the yard is cement, there is no grass yard and they don't run night yards; commissary is limited; there are no out-of-cell religious services (instead chaplains visit at the cells). Def. Ex. 2, Pfister, 22:15–27:19, 30:3–9; Def. Ex. 3, Tejeda, 26:10–28:6, 50:2–14, 51:10–13; see Pl. Ex. 8, ¶18.

**RESPONSE**: **Undisputed.**

7. In some ways, the conditions for receiving-status prisoners at Reception Center are as restrictive or more restrictive than disciplinary segregation. Def. Ex. 2, Pfister, at 27:17-19; Pl. Ex. 2, Pieper, 41:20-42:17. See also Pl. Ex. 1, Venerable, 39:23-40:21 ("when I first saw NRC I thought it was a seg unit … it was totally different than general pop prison"); Pl. Ex. 9, AD 05.07.102, at IDOC_001042 (page 6 of 6) (comparing privileges on reception-status to privileges on reception-segregation status).

**RESPONSE**: **Undisputed.**

8. During Plaintiff's incarceration there, Reception Center prisoners typically received "yard" once a week for two to three hours in a 50x100 foot concrete area, at the end of each housing unit, with no grass and no awning for shade. Def. Ex. 2, Pfister, 23:2–8; Def. Ex. 3, Tejeda, 28:9–30:9.

**RESPONSE**: **Disputed. Def. Ex. 2, Pfister Q" "Might you agree that at NRC, the inmates are – get out of cell time about four or five hours a week?" A: I – I'm—I'm not going to agree or disagree with that statement. I don't – I can't answer that. I don't know. I thought it was more than that." 23:15-21. "I think they go twice a week, yeah, for a total of five." 115:17-18. Defendants' further dispute the above assertions to the extent that Plaintiff is claiming that he ever intended to leave his cell. Ex. 1 at 71:9-72:16.**

9. Both Warden Pfister and Assistant Warden Tejeda regularly conducted rounds in the Reception Center housing units, during which they spoke with prisoners in the housing units. Def. Ex. 2, Pfister at 30:21–32:16; Def. Ex. 3, Tejeda, at 31:13–32:15, 37:15–39:24, and 39:6-40:14; Pl. Ex. 19.

**RESPONSE**: **Dispute to the extent that Plaintiff's characterization suggests he spoke to Warden Pfister. Ex. 1 at 125:7-126:6 (explaining that his only interactions with Warden Pfister are through the grievance process).**

10. Defendants have knowledge of insects, mice, birds, and flooding in the Reception Center from their own experience and from grievances. Def. Ex. 3, Tejeda, 44:22-45:1 (he saw bugs and insects "everywhere" at the NRC), 45:2-46:5 (he saw mice in his office at the NRC and birds in the receiving area); Pl. Ex. 4, 30(b)(6) Dep, Daly, 31:17-19 (aware of complaints about insects), 33:16-34:6 (flooding is a "common occurrence" at the NRC), 41:7-16 (saw mice in the buildings), 42:2–10 (has seen birds in housing units of NRC); Def. Ex. 2, Pfister, 74:5–75:14 (grievance reports), 76:18–77:15 (acknowledging vermin, insects and rodents at NRC); Def. Ex. 4, McBee, 28:17–29:25 (typically receive at least 100 grievances about mice during October, when the fields are plowed), 30:9–14 (insects).

**RESPONSE: Undisputed and immaterial. The above assertions are immaterial to the extent the facts contained in paragraph 10 have no bearing on Defendants' defenses of exhaustion, lack of personal involvement, lack of deliberate indifference, Plaintiff's conditions of confinement, and disability discrimination arguments.**

**William Richard**

11. On June 23, 2015, William Richard, a 61-year-old man, entered the custody of the Department of Corrections. Def. SEALED Ex. 17, at IDOC_001090 (page 19 of 56). William Richard was classified as medium-security during intake at the Reception Center. Def. SEALED Ex. 17, Transfer Documents, at 1077–79.

**RESPONSE**: **Undisputed.**

12. The Department knew on June 23, 2015 that Mr. Richard used oxygen. Pl. Ex. 11, at IDOC_001143 (page 1 of 18). All parent facilities have infirmaries capable of housing someone with oxygen needs, and it is the Department's practice to house people who use oxygen in the infirmary at their parent facility. Def. Ex. 5, Stephens, 36:22–39:16 (there are no facilities that someone who needed a cane and an oxygen tank could not go).

**RESPONSE**: **Undisputed as to the first sentence. Dispute second sentence to the extent that Plaintiff's characterization suggest that the NRC does not have these capability to house someone with oxygen needs *See* Ex. 7 at 14:20-24, 15:1-25, 57:2-7, 88:12-19; Ex. 14.**

13. On July 2, 2015, a correctional officer came to Mr. Richard's cell to take him to the transfer bus, but then told Mr. Richard that he would not be able to get on the regular transfer bus with oxygen, and said he would come back to get him. Def. Ex. 1, Richard, at 46:8–20; Pl. Ex. 11, IDOC_002806 (transfer pull email) (page 5 of 18).

**RESPONSE**: **Undisputed.**

14. Mr. Richard did not have any court writs or medical holds requiring him to remain at the Receiving Center. Pl. Ex. 22, Def's Answer to Pl.'s 1st RFA ¶¶ 4-6; See also Pl. Ex. 10, 90 Day Reports. He was medically cleared to transfer. Pl. Ex. 11, at IDOC_005251-53 (pages 15–17 of 18).

**RESPONSE**: **Undisputed.**

15. Defendants could have transported William Richard on the regular transfer vehicle, along with other prisoners, by "storing the oxygen tank within staff's view." Def. Ex. 3, Tejeda, 113:15-24; see also Def. Ex. 7, Engleson, 85:6-14 (Mr. Richard did not need a wheelchair-accessible vehicle be transported); Pl. Ex. 11 at IDOC_001398 (page 6 of 18), IDOC_005251-53

(pages 15-17 of 18); Def. SEALED Ex. 17, Transfer Documents, at 1079 (listing critical needs as "cane/walker").

**RESPONSE**: **Disputed. Exhibit C, Deposition of Ricardo Tejeda 118:5-19 ("Q: When the oxygen tank would be stored in view of other officers, do you know in that situation if the offender would still be able to use the oxygen Tank? A During the transfer? Q:Correct. A: I am not sure. I am pretty sure in an emergency situation, it's a possibility, but I am not sure**.")

16. About 200 prisoners pass through the Reception Center each week. Def. Ex. 3, Tejeda, 24:6-13.

**RESPONSE**: **Undisputed and immaterial**. **The above assertions are immaterial to the extent the facts contained in paragraph 16 have no bearing on Defendants' defenses of exhaustion, lack of personal involvement, lack of deliberate indifference, Plaintiff's conditions of confinement, and disability discrimination arguments.**

17. On July 2, 2015, the wardens and other relevant staff, including Defendant Assistant Warden Tejeda and the superintendent who worked under him, Tracy Engleson, were notified that Mr. Richard had been pulled from his approved transfer to Western Illinois Correctional Center due to his oxygen needs. Pl. Ex. 11, IDOC_002806 (transfer pull email) (page 5 of 18); Def. Ex. 7, Engleson, 61:16-19.

**RESPONSE**: **Undisputed**.

18. Warden Pfister could have approved overtime for Reception Center staff to take William Richard to Western Illinois Correctional Center, as had happened in the past. Def. Ex. 3, Tejeda, 84:3-85:24, 87:4-9.

**RESPONSE**: **Disputed and immaterial. Disputed to the extent that Warden Pfister could have arranged or ordered a transfer for Plaintiff. An inmate with serious medical needs cannot be transferred without the approval of the Office of Health Services and the Transfer Coordinator's Office's approval. See Ex. 5 at 12:6-14, 15:5-18, 16:7-23, 25:9-24, 26:1-20; 102:8-24; Ex. 7 at 37:7-20. The above assertions are immaterial as Plaintiff's delayed transfer was a result of insufficient bed space, not a lack of action on the part of Defendant Pfister. Defs.' Ex. 16 at IDOC_1422-24, 5191, 5198, 5201; Pl. Ex. 14.**

19. Assistant Warden Tejeda could have approved overtime for NRC staff to take William Richard the entire way to Western Illinois Correctional Center. Def. Ex. 7, Engleson, 52:22-25 (Tejeda could authorize overtime).

**RESPONSE**: **Disputed and immaterial. Disputed to the extent that Assistant Warden Tejeda could have arranged or ordered a transfer for Plaintiff. An inmate with serious medical needs cannot be transferred without the approval of the Office of Health Services and the Transfer Coordinator's Office's approval. See Ex. 5 at 12:6-14, 15:5-18, 16:7-23, 25:9-24, 26:1-20; 102:8-24; Ex. 7 at 37:7-20. The above assertions are immaterial as Plaintiff's delayed transfer was a result of insufficient bed space, not a lack of action on the part of Defendant Tejeda. Defs.' Ex. 16 at IDOC_1422-24, 5191, 5198, 5201; Pl. Ex. 14.**

20. Mr. Richard was housed at the Reception Center from June 22, 2015 to June 1, 2016. Def. Ex. 1, Richard, 30:14–21, 50:10–11; Pl. Ex. 22, Def's Answer to Pl.'s 1st RFA ¶¶4.

**RESPONSE**: **Undisputed**.

21. At the Reception Center, Mr. Richard was not allowed to go out to yard for recreation and fresh air. Def. Ex. 1, Richard, 67:3–7, 71:9–72:16. His only out-of-cell time, other than

weekly showers, was when he went to medical appointments (sick call) or for his 2–3 visits from his brother. Id. 132:6-12; Pl. Ex. 16, April 4, 2016 grievance.

**RESPONSE: Disputed. Mr. Richard was allowed to go out to yard for recreation and fresh air, but refused to go because he would not leave his cell without his oxygen tank. Exhibit A, Deposition of William Richard 67:5-7 ("Well, they wouldn't let me because they wouldn't give me oxygen tank. They said it was a weapon.") Exhibit C, Deposition of Ricardo Tejeda 28:9-29:17.**

22. Mr. Richard's cell was often hot, with little air circulation, and was frequently visited by mice and insects. Def. Ex. 1, Richard, 65:5-66:19, 132:8-133:24. Birds sat on his chuckhole and left droppings on it. Id. at 45:1-16; 62:14-63:2, 64:18-65:4.

**RESPONSE**: **Undisputed and Immaterial. Immaterial as to Defendants' defense of lack of personal involvement, lack of discriminatory intent, and Plaintiff's exhaustion of administrative remedies.**

23. Mr. Richard's cell occasionally flooded when prisoners above him flooded their cells; the water pooled in his cell and would take a day or two to drain. Def. Ex. 1, Richard, 45:1-13; Pl. Ex. 4, 30(b)(6) Dep, 33:16–34:6 (NRC prisoners frequently flood their cells by knocking off the sprinkler heads in their cells).

**RESPONSE**: **Disputed. Disputed to the extent Plaintiff's characterization suggests any flooding in Plaintiff's cell was not address. Further disputed to the extent that Plaintiff's citation does not support the facts contained in paragraph 2. Pl. Ex. 4, 30(b)(6) Dep 34:19-35:4 (Q: Would there maybe be emails about flooding? A. Almost certainly not, but – so here's what I can tell you on that, oddly enough. What you'll see on those particular issues is the call – we're here during the day. If it happens during business house, there wouldn't**

**be a work order generated anyway, which tends to be the case. It's a call, it's a bang, guys go there, and they do it right away.")**

24. Mr. Richard's oxygen device was placed outside his cell, with the tube running through the chuck hole or under the door. Def. Ex. 1, Richard, 135:8–23; see also Def. Ex. 2, Pfister, 34:7-18, 35:6-21; Def. Ex. 3, Tejeda, 49:4-12.

**RESPONSE**: **Undisputed**.

25. Mr. Richard only received replacement tubing for his oxygen device every two or three months and was not given sanitation supplies for it in the meantime. Def. Ex. 1, Richard, 135:8–137:4.

**RESPONSE**: **Dispute to the extent that IDOC employees were involved in providing medical equipment and medical supplies. "Q: Okay. Never mind. So in your lawsuit you allege that, you know, you had a dirty tube and you didn't have the materials to clean it; am I correct? A: Right. Oh, yes. Q: Did you ever get a sore throat from that? A: Yes, I did. Q: Did you ever go talk to a Wexford doctor about it? A: Yes, I did." 127:10-18; "And it got dirty so I got to wash it off, ask for another one. No, you not going to get another one. By Ms. Reed: Q: So sometimes they refuse to give you—oh, a lot of times. Q: and was that security staff or was that medical staff? A. That's medical. So medical – really you're supposed to get – in the world we do it like every seven days. Here in Dixon they do it every 14 days. In NRC they do it whenever they feel like. You might have this same one for like two or three months." 135:6-18.**

26. When William Richard received his CPAP machine in May 2016, he could not plug it in because his cell did not have an electrical outlet. Def. Ex. 1, Richard, 49:12–50:3.

**RESPONSE**: **Admit that there was not an electrical outlet outside of his cell. However, Defendants dispute the above assertion that Plaintiff could not plug in his CPAP machine to use it because there was a plug outside of his cell. See Ex. 7 at 14:20-24, 15:1-25, 57:2-7, 88:12-19; Ex. 14.**

27. At the Reception Center, Mr. Richard suffered a respiratory infection, sore throat, rash, skin irritation, bug bites, and depression. Def. Ex. 1, Richard, 60:9-14 (bug bites), 126:7–9 (respiratory infection), 127:10–20 (sore throat), 131:10–12 ("That really hurts me. I think about it every day. And I was on all this depression medication here. I ain't even know where I was going."); Pl. Ex. 3, Duffield, 103:6–104:10 (reviewing IDOC_000455) (sore throat), 99:5-100:8 (reviewing IDOC_000448) (rash), 101:17–103:3 (reviewing IDOC_000457) (rash); Pl. Ex. 12, page 4–6 (sore throat, rash); Pl. Ex. 13, Mental Health Record Excerpts ("depression," "can't sleep," "getting frustrated," "upset he has not left," "caring for himself as best he can, but the stress is getting to him.").

**RESPONSE**: **Undisputed**.

28. Mr. Richard would sit up throughout the night, only getting two or three hours of sleep, in fear he would die in his sleep from respiratory distress. Def. Ex. 1, Richard, 45:18-46:7, 138:10-139:11. Pl. Ex. 12, at IDOC_000448 (page 5 of 6) (insomnia).

**RESPONSE**: **Disputed**. **Def. Ex. 1, Deposition of William Richard "When I sit up I got so used to it in 11 and a half months, it wasn't no problem. I just get me a nice little nod."**

29. On September 9, 2015, an Assignment Coordinator in the Transfer Coordinator's Office copied Assistant Warden Tejeda on an email in an ongoing email thread regarding William Richard's transfer. Pl. Ex. 11, IDOC_001422-24 (page 8-10 of 18). In the email, the Assignment Coordinator wrote that there were 5 beds at Robinson, and "I seem to be the only

one following up on MY emails with these ADA/Infirmary guys. My suggestion, again, is that you contact [Robinson] for placement. My stack keeps growing!" Id.

**RESPONSE**: **Undisputed**.

30. On September 18, 2015, an outpatient progress note records that Mr. Richard was "upset that he is still here" and that the clinician would speak to Superintendent Engleson about it. Pl. Ex. 12, at IDOC_000449 (page 3 of 6).

**RESPONSE**: **Disputed and immaterial. The above statement is inadmissible hearsay that is not subject to the exception listed in FRE 803(4) because it is not a statement made for—and reasonably pertinent to—medical diagnosis or treatment. In addition, the clinician's statement that she will speak to Superintendent Engleson is hearsay under FRE 801 as an out of court statement being offered to prove that Superintendent was informed of Plaintiff's concerns by an unidentified member from the medical staff. Furthermore, this information is immaterial because Tracy Engleson is not a defendant to this action.**

31. Beginning on October 2, 2015 and repeating each week thereafter, Assistant Warden Tejeda received weekly reports showing that Mr. Richard had been at the Reception Center for over 90 days due to "ADA transport." Pl. Ex. 10, 90 Day Reports; Def. Ex. 3, Tejeda, 89:22-91:11, 94:12-95:14.

**RESPONSE**: **Undisputed**.

32. During a conversation in the visiting area on October 5, 2015, Mr. Richard told Assistant Warden Tejeda about his situation and transfer, and Assistant Warden Tejeda responded that he would look into it. Def.'s SOF ¶39; Def. Ex. 1, Richard, 48:3–49:11, 58:15–21; Pl. Ex. 11, at IDOC_001422-24 (page 8–10 of 18) (Oct. 5, 2015 email from AW Tejeda to Supt. Engleson re Plaintiff stating "let's see if we can get this offender out of the NRC"); Pl. Ex.

19, IDOC_006631 (Tejeda's handwritten note stating "Richard William M52274 O-105 Transfer").

**RESPONSE**: **Undisputed**.

33. On October 6, 2015, Chief Austin emailed Assistant Warden Tejeda to follow up on the conversation they had had with William Richard the day before, to which AW Tejeda responded that it had been "addressed." Pl. Ex. 11, at IDOC_001435 (page 11 of 18) (Oct. 6, 2015 email exchange between AW Tejeda and Glen Austin).

**RESPONSE**: **Undisputed**.

34. The only emails Assistant Warden Tejeda sent to follow up on William Richard's transfer were the email to Superintendent Engleson on October 5, 2015 and the email to Chief Austin on October 6, 2015. Pl. Ex. 11, at IDOC_001422–24 (page 8–10 of 18) (Oct. 5, 2015 email from Assistant Warden Tejeda to Superintendent Engleson re Plaintiff stating "let's see if we can get this offender out of the NRC"); Id. at IDOC_001435 (page 11 of 18) (Oct. 6, 2015 email exchange between Assistant Warden Tejeda and Chief Austin confirming that Tejeda has followed up on their conversation with William Richard regarding his transfer).

**RESPONSE**: **Undisputed**.

35. In November and December 2015, Assistant Warden Tejeda knew that William Richard was still at the Reception Center. Def. Ex. 3, Tejeda, 124:1–17.

**RESPONSE**: **Undisputed**.

36. On November 13, 2015, Warden Pfister began receiving weekly 90-day reports listing William Richard as remaining at the NRC for over 90 days due to "ADA transport." Pl. Ex. 10; Def. Ex. 2, Pfister, 39:17–43:21.

**RESPONSE**: **Undisputed**.

37. The purpose of the weekly 90-day reports was to keep everybody at the Reception Center informed on the numbers of individuals still there, so that Warden Pfister and his staff could "make sure we stay on top of keeping people transferring out" of the NRC. Def. Ex. 2, Pfister, 40:10–42:20; see also Def. Ex. 3, Tejeda, 125:4-16.

**RESPONSE**: **Undisputed**.

38. It was the responsibility of the assistant wardens to "stay on top of" the 90-day lists and "keeping people transferring out of here." Def. Ex. 2, Pfister, at 41:7–18, 42:13–20. Warden Pfister expected the assistant wardens to stay in contact with the transfer coordinator's office to make sure that they individuals on the 90-day list get transferred as soon as possible. Id. at 41:7–42:20, 52:15–53:15; see also Def. Ex. 3, Tejeda, 121:22–123:15.

**RESPONSE**: **Undisputed**.

39. Warden Pfister could have called the Transfer Coordinator's Office and the Office of Health Services to follow up on a prisoner who had been at the Reception Center for over six months. Def. Ex. 2, Pfister, 52:15–53:15 (explaining that he would typically call the Transfer Coordinator's Office and the Office of Health Services to follow up on a prisoner who had been at the Reception Center for over six months).

**RESPONSE**: **Disputed and immaterial. Disputed to the extent that Warden Pfister could have arranged or ordered a transfer for Plaintiff. An inmate with serious medical needs cannot be transferred without the approval of the Office of Health Services and the Transfer Coordinator's Office's approval. See Ex. 5 at 12:6-14, 15:5-18, 16:7-23, 25:9-24, 26:1-20; 102:8-24; Ex. 7 at 37:7-20. The above assertions are immaterial as Plaintiff's delayed transfer was a result of insufficient bed space, not a lack of action on the part of Defendant Pfister. Ex. 16 at IDOC_1422-24, 5191, 5198, 5201; Pl. Ex. 14.**

40. On December 2, 2015, Plaintiff filed a grievance stating that he had "been in NRC for 6 months [waiting] on a bed space," as well as listing his medical conditions and that he had "been on oxygen since 2007 and a sleepy machine." The grievance also stated that he had spoken to his counselor, Ms. Miller, and Warden Tejeda about these issues. Pl. Ex. 14.

**RESPONSE**: **Disputed to the extent that Plaitniff is arguing that the above information shows that he exhausted his administrative remedies. Ex. 4 at 13:15-16:25.**

41. Mr. Richard's literacy level is at or below a first-grade level. Pl. Ex. 18.

**RESPONSE**: **Immaterial and disputed to the extent that Plaitniff is arguing that the above information shows that he grievance process was unavailable to him and thus could not exhaust his administrative remedies. Ex. 4 at 13:15-16:25.**

42. In December 2015, Plaintiff's cellmate, Anthony White, explained to him that he needed to file a grievance because he had been at the Reception Center too long. Def. Ex. 1, Richard, 83:3-24. White explained what to put in the grievance is "something that you dislike or something that wasn't going right or they didn't do right, and that's about it" and told him "how to write it word to word." Id. at 83:17-24.

**RESPONSE**: **Disputed to the extent that Plaitniff is arguing that the above information shows that he exhausted his administrative remedies. Ex. 4 at 13:15-16:25.**

43. Warden Pfister understood William Richard's December 2, 2015 grievance to be complaining that Mr. Richard had been at the Reception Center for more than six months. Def. Ex. 2, Pfister, 58:6-9. 44.

**RESPONSE**: **Disputed. Warden Pfister testified he had not personally reviewed or signed off on the grievance and was seeing it for the first time during his deposition. Exhibit B, Deposition of Randy Pfister 57:11-58:5.**

44. According to Warden Pfister, the grievance officer and other staff responding to the grievance should have looked into why Mr. Richard had been at the NRC for more than six months. Def. Ex. 2, Pfister, 60:15–61:21. Warden Pfister does not know why that was “overlooked.” Id. at 60:20–21.

**RESPONSE**: **Disputed to the extent Plaintiff suggests that Warden Pfister knew about Plaintiff’s grievances and that no one looked into his grievances or inquired into Plaintiff’s transfer.**

45. After he filed his December 2, 2015 grievance. Mr. Richard’s counselor, Ruth Miller, explained to him the steps he had to go through. Def. Ex. 1, Richard, at 80:7–17, 81:20–22.

**RESPONSE**: **Disputed to the extent Plaintiff is arguing that the above information shows that he exhausted his administrative remedies. Ex. 4 at 13:15-16:25.**

46. Counselor Miller responded to the grievance, stating that “a copy of this grievance has been forwarded to the HCU for review and response and the original grievance has been forwarded to the grievance office. There is no need to send your copy to the grievance office or the HCU. You will receive a final response from the grievance office when the HCU responds to same.” Def. Ex. 1, Richard, 92:4–23. Pl. Ex. 14, December 2, 2015 grievance.

**RESPONSE**: **Disputed to the extent that Plaintiff is arguing that the above information shows that he exhausted his administrative remedies. Ex. 4 at 13:15-16:25.**

47. William Richard submitted another grievance on February 6, 2016, using the exact same language as was in his December 2, 2015 grievance, including that he had been in the Reception Center since June 23, 2015 and needed to go to a “medical facility.” Pl. Ex. 15. His correctional counselor, Wendell Venerable, responded on February 6, 2016, again telling him

that "[a] copy of this grievance has been sent to HCU. The original has been sent to the grievance office. You'll receive a response when the HCU replies to the grievance." Pl. Ex. 15.

**RESPONSE**: **Undisputed**.

48. On February 22, 2016, the grievance officer reviewed the December 2, 2015 grievance and responded with the recommendation that "No action as grievant appears to be receiving appropriate medical care at this time." Pl. Ex. 20 at IDOC_001134. The Chief Administrative Officer signed off on the response on February 24, 2016. Id.

**RESPONSE**: **Disputed that Chief Administrative Officer signed off on the response**. **Exhibit B, Deposition of Randy Pfister 57:11-58:5. In addition, Defendants dispute the above assertion to the extent that Plaintiff is arguing that the above information shows that he exhausted his administrative remedies.**

49. The Administrative Review Board received Mr. Richard's December 2, 2015 grievance regarding medical treatment and transfer on February 1, 2016. Pl. Ex. 21. The ARB responded on February 9, 2016, advising him, among other things, to "contact your correctional counselor regarding this issue to inquire on transfer status." Id.

**RESPONSE**: **Disputed to the extent that Plaintiff is arguing that the above information shows that he exhausted his administrative remedies. Ex. 4 at 13:15-16:25.**

50. The Transfer Coordinator's Office does not review grievances about transfer issues. Def. Ex. 5, Stephens, 110:2–18.

**RESPONSE**: **Undisputed and immaterial. The Transfer Coordinator's Office is not a part of the grievance process. Ex. 4 at 13:15-16:25.**

51. William Richard filed another grievance on April 7, 2016, stating, among other things, that he had several serious medical conditions including COPD, emphysema, asthma, and

heart disease, that he had "been in solitary confinement for ten months, 23 hours a day," had never gotten his CPAP machine, did not have any court writs or medical hold, felt that he had been "torture[d]" and "deprive[d] of all meaningful human contact for more than 10 months," that he hadn't had any exercise due to his oxygen tank, and could only shower once per week. Pl. Ex. 16; Def. Ex. 1, Richard, 113:7–117:15.

**RESPONSE**: **Disputed to the extent that Plaintiff is arguing that the above information shows that he exhausted his administrative remedies. Ex. 4 at 13:15-16:25.**

52. William Richard wrote to the Administrative Review Board in November 2016 because he still had not received a response to his April 7, 2016 grievance. Pl. Ex. 16, at IDOC_000978 (page 1 of 4).

**RESPONSE**: **Undisputed**.

53. In April 2016, William Richard saw Assistant Warden Tejeda again while waiting to see a doctor and told Tejeda that he had been bitten by bugs in his cell at the NRC. Def. Ex. 1, Richard, 60:3–17. 54.

**RESPONSE**: **Undisputed**.

54. Warden Pfister cannot identify anything he did to ensure that Mr. Richard was transferred out of the Reception Center as soon as possible. Def. Ex. 2, Pfister, 52:9–14.

**RESPONSE**: **Disputed to the extent Plaintiff suggests Warden Pfister had the responsibility to look into Plaintiff's transfer. The duty of looking into and arranging inmate transfers from the NRC was within the responsibilities and purview of the Superintendent Tracy Engleson. *See* Ex. 7 at 72:10-73:2.**

55. Assistant Warden Tejeda cannot identify anything he did, other than sending one email to Superintendent Engleson on October 5, 2015 and one email to Chief Austin on October

6, 2015, to make sure that William Richard was transferred out of the NRC as soon as possible. Def. Ex. 3, Tejeda, 65:1–67:5, 78:9–82:17; 123:1–14; see also Pl. Ex. 11, at IDOC_001422–24 (page 8–10 of 18) (Oct. 5, 2015 email from Assistant Warden Tejeda to Superintendent Engleson re Plaintiff stating "let's see if we can get this offender out of the NRC"); Id. at IDOC_001435 (page 11 of 18) (Oct. 6, 2015 email exchange between Assistant Warden Tejeda and Chief Austin confirming that Tejeda has followed up on their conversation with William Richard regarding his transfer).

**RESPONSE**: **Disputed to the extent Plaintiff suggests that Assistant Warden Tejeda had the responsibility to look into Plaintiff's transfer. The duty of looking into and arranging inmate transfers from the NRC was within the responsibilities and purview of the Superintendent Tracy Engleson. *See* Ex. 7 at 72:10-73:2.**

Dated: December 20, 2019

Respectfully submitted

KWAME RAOUL
Attorney General of Illinois

By: */s/ James A. Robinson*
JAMES A. ROBINSON
Assistant Attorney General
Office of the Illinois Attorney General
100 W. Randolph St., 13th Floor
Chicago, Illinois 60601
(312) 814-7199
jrobinson@atg.state.il.us

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 20, 2019, he electronically filed the foregoing Defendants' Response to Plaintiff's LR 56.1(B)(3)(C) Statement of Additional Facts with the Clerk of the Court for the Northern District of Illinois and all counsel of record were served by using the CM/ECF system.

*/s/ Benjamin C.R. Lockyer*
Benjamin C.R. Lockyer
Assistant Attorney General