UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WILLIAM H. RICHARD,<br><br>    Plaintiff,<br><br>    v.<br><br>RANDY PFISTER, Warden, RICARDO TEJEDA, Assistant Warden, and ROB JEFFREYS, Acting Director of the Illinois Department of Corrections<br><br>    Defendants. | No. 17 C 4677<br><br>Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Plaintiff William Richard brings this action against Warden Randy Pfister, Assistant Warden Ricardo Tejeda, and Acting Director of the Illinois Department of Corrections Rob Jeffreys in his official capacity[1] for violating the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and the Eighth Amendment. Defendants moved for summary judgment. R. 108. For the following reasons, their motion is denied.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[1] Jeffreys is automatically substituted for John Baldwin pursuant to Federal Rule of Civil Procedure 25(d). While the second amended complaint states that Richard is also suing Baldwin in his individual capacity, his response to Defendants' motion for summary judgment does not mention Baldwin a single time and so the Court assumes any claim to this extent has been dropped.

matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background

William Richard suffers from asthma, emphysema, diabetes, chronic obstructive pulmonary disease, and heart disease. R. 126 ¶¶ 22, 24. In June 2015, at 61 years old, Richard entered custody of the Illinois Department of Corrections ("IDOC"). R. 132 ¶ 11. At that time, Richard used an oxygen tank, continuous positive airway pressure (CPAP) machine, and cane or walker (he's now in a wheelchair). R. 126 ¶ 23; R. 112 at 7-8.

Like many inmates entering IDOC custody, Richard first reported to the Northern Reception and Classification Center ("NRC"). R. 132 ¶ 11. The NRC serves as an intake facility where inmates typically stay for one to two weeks before being transferred to a "parent facility" where they complete their term of incarceration. *Id.* ¶ 1. Inmates are significantly more restricted at NRC than in general population

settings at parent facilities. *Id.* ¶ 6. Among other things, NRC has no day room, gym, library, educational or vocational programs, or out-of-cell religious services. *Id.* Inmates eat meals in their cells, which lack natural light and electrical outlets, where they remain 22-24 hours a day. *Id.* ¶¶ 3-6. In many ways, conditions at NRC resemble those in disciplinary segregation. *Id.* ¶ 7.

Eight days after Richard arrived at NRC, he was approved to transfer to Western Correctional Center. R. 126 ¶ 27. When a correctional officer saw Richard's oxygen tank, however, he said it was not allowed on the regular transfer bus and Richard would have to wait to transfer. R. 132 ¶ 13.[2] Just over a month later, NRC Superintendent Tracy Engleson contacted the IDOC's Transfer Coordinator's Office about arranging a car transport for Richard. R. 126 ¶ 32. In early September, it was determined that Richard could be transferred by car and did not need an ADA van. R. 110-16 at 22. But for reasons that are not entirely clear, Richard remained at NRC. In an email regarding Richard, an assignment coordinator in the Transfer Coordinator's Office wrote that "I seem to be the only one following up on MY emails with these ADA/Infirmary guys. My suggestion, again, is that you contact [Robinson] for placement. My stack keeps growing!" *Id.* at 5.

Starting in October 2015, Assistant Warden Tejeda, who oversaw the NRC, began receiving weekly reports that Richard had been at the prison for over 90 days

---

[2] Defendants represent in their statement of material facts that this was because Richard could not be accommodated in the event of an emergency and the oxygen tank could be used as a weapon. But their citation to the record is unrelated and appears to have been made in error. R. 126 ¶¶ 29-30.

3

due to "ADA transport." R. 132 ¶ 31. On October 5, Richard told Tejeda directly about his situation and Tejeda said he would look into the issue. *Id.* ¶ 32. Tejeda then emailed Engleson stating "let's see if we can get this offender out of [here]." *Id.* The next day, Tejeda responded to an email from a different IDOC official about Richard that "[t]his has already been addressed. The NRC is waiting for Western IL to give us a date so we can meet them halfway so we can turn this offender over to them." R. 127-11 at 11.

By December, when Richard had still not been transferred, he submitted a grievance stating that he had "been in NRC for 6 months [waiting] on a bed space" in the infirmary unit at a parent facility. R. 132 ¶ 40; R. 127-14 at 1. After Richard did not receive a response, he filed a second grievance with identical language in February 2016. R. 132 ¶ 47. Two weeks later, a grievance officer responded to Richard's December grievance recommending "[n]o action as grievant appears to be receiving appropriate medical care at this time." R. 127-20. On April 7, 2016, Richard filed a third grievance listing his medical conditions, stating that he had "been in solitary confinement for ten months, 23 hours a day," had never gotten a CPAP machine, had gotten no exercise, and had been deprived of all meaningful human contact. R. 127-16 at 2-4. Richard also saw Tejeda again in April and told him that he had been bitten by bugs in his cell. R. 132 ¶ 53.

On April 8, Richard was reapproved for transfer (transfer approval lapses every 90-120 days) and assigned for placement in the infirmary at Dixon Correctional

4

Center. R. 126 ¶¶ 47, 50. Richard was transported to Dixon by car on June 1, 2016. *Id.* ¶¶ 52, 56.

Richard brings claims for violations of the ADA, the Rehabilitation Act, and the Eighth Amendment. The Defendants moved for summary judgment on all counts.

## Analysis

### I. ADA and Rehabilitation Act

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation or be denied benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.[3] To establish an ADA violation, Richard must show that: (1) he is a qualified individual with a disability; (2) the IDOC denied him the benefits of its services, programs, or activities, or otherwise subjected him to discrimination; and (3) the denial or discrimination occurred "by reason of" his disability. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). One way to show discrimination under the ADA is a failure to provide reasonable accommodations. *Wisc. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006); *see also Hildreth v. Butler*, 960 F.3d 420, 430 (7th Cir. 2020) ("The ADA imposes a duty to provide reasonable accommodations to disabled persons."). To recover compensatory damages on an ADA claim, a plaintiff "must show deliberate

---

[3] For purposes of this opinion, there is no material difference between the ADA and the Rehabilitation Act, and the Court thus analyzes them together, referring primarily to the ADA. *See Vaughn v. Walthall*, 2020 WL 4500008, at *3 (7th Cir. 2020).

indifference, which occurs when defendants 'knew that harm to a federally protected right was substantially likely and . . . failed to act on that likelihood.'" *Hildreth*, 960 F.3d at 431 (quoting *Lacy v. Cook Cty.*, 897 F.3d 847, 862 (7th Cir. 2018)).

Defendants do not dispute that Richard is a qualified person with a disability. The only remaining issue is whether he was denied the benefits of IDOC's services, programs, or activities because of his disability. Richard contends that Defendants' failure to provide an accommodation for him to transfer from NRC with his oxygen tank denied him access to the programs and services available at parent facilities.

Most inmates transfer from the NRC to parent facilities within one to two weeks. Like those inmates, Richard was approved to transfer eight days after his arrival. He had no court writ or medical hold preventing him from leaving. R. 132 ¶ 14. On his transfer date, however, he was told that he could not go with his oxygen tank. For the next 11 months, Richard remained at NRC. During that time, he could not access or utilize educational and vocational programs, out-of-cell religious services, a day room, gym, or library, all of which are available to inmates at parent facilities and constitute programs, activities, or services under the ADA. *See Simmons v. Godinez*, 2017 WL 3568408, at *6 (N.D. Ill. Aug. 16, 2017) ("The Supreme Court recognized that [ADA] 'services, programs, or activities' include recreational, medical, educational, and vocational prison programs.") (citing *Penn Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998)); *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) (religious services and substance abuse program are services, programs, or activities under ADA). Richard contends that he could have been transferred, and

6

thus participated in those programs, had the Defendants stored his oxygen tank within the staff's view on the transfer bus or approved overtime for NRC staff to drive him. *See* R. 110-3 at 29 (Tejeda Dep. 113:15-24); R. 110-7 at 14 (Engleson Dep. 51:24-52:25).

Defendants argue that putting Richard on the transfer bus presented a safety concern, but they do not deny that overtime could have been approved to transfer him by car or that such a request was otherwise unreasonable. *See Love*, 103 F.3d at 560 ("[Defendant] did not defend on the ground that no reasonable accommodations existed that would have allowed [plaintiff] to access those programs."). Rather, they contend that Richard's ADA rights were not violated because inmates do not have a right to transfer prisons. As an initial matter, this is not a case where Richard was requesting transfer from one permanent institution to another. As Tejeda acknowledged at his deposition, "the whole premise of the NRC [is] to transfer you out." R. 110-3 at 29 (Tejeda Dep. 112:15-16). But regardless, to prevail on his claim, Richard only needs to show that, because of his disability, Defendants deprived him of accessing IDOC services "on the same basis" as other inmates. *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012); *see also* 28 C.F.R. § 35.130(b)(1)(ii) (a public entity may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others"). And whereas most inmates with Richard's security classification have access to the programs and services at parent facilities almost immediately, Richard had to wait 11 months to access those same programs and

7

services.⁴ On these facts, a reasonable jury could readily conclude that by not providing transport for Richard with his oxygen tank for nearly a year, they failed to make a reasonable accommodation in violation of the ADA and Rehabilitation Act. *See Jaros*, 684 F.3d at 672 ("Refusing to make reasonable accommodations is tantamount to denying access."); *see also Cook v. Illinois Dep't of Corr.*, 2018 WL 294515, at *2-3 (S.D. Ill. Jan. 4, 2018) (delay in transferring disabled inmate to facility with drug treatment program created material issue of fact as to whether he was denied benefit of the program based on his disability).⁵

Finally, Defendants argue that Richard has not shown any discrimination was intentional and thus is not entitled to compensatory damages. Defendants do not dispute that they knew Richard had not been transferred (and thus was unable to access programs and services available at parent facilities). Nor could they, as Richard submitted multiple grievances, spoke directly with Tejeda, and was on the

---

⁴ Defendants contend that a finding in Richard's favor would allow disabled inmates to claim discrimination whenever a program exists at a different facility and their transfer request is denied. This concern is misplaced. The facts alleged in this case are as unique as they are troubling. Moreover, "[t]he ADA does not require perfect parity among programs offered by various facilities that are operated under the same umbrella institution." *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1221 (9th Cir. 2008). Richard's claim is not that he could not access a specific program available elsewhere, but that he was housed in segregation-like conditions for nearly a year because of his disability, and thus he had access to almost *none* of the programs available to other inmates. *See id.* ("[T]he County may not shunt the disabled into facilities where there is no possibility of access to [its] programs."); *see also* 28 C.F.R. § 35.152(b)(2)(iii) (a public entity "shall not place inmates or detainees with disabilities in facilities that do not offer the same programs as the facilities where they would otherwise be housed").

⁵ While Richard does not advance this theory, it seems that he also could have claimed the transportation itself from NRC to a parent facility was the service (as opposed to the services available at parent facilities) to which he was denied equal access.

8

weekly 90-day transfer report for months. Nevertheless, they argue that they did not act with deliberate indifference. First, they contend that Richard was not transferred because there were not available infirmary beds at other facilities. But every parent facility has an infirmary capable of housing inmates with oxygen needs, R. 110-5 at 10 (Stephens Dep. 37:1-20), and there is evidence in the record suggesting that beds were available at least at one of them. *See* R. 110-16 at 34 (email stating Robinson Correctional Center had beds available). Defendants also represent that the delay in transfer was due to "logistical issues" and "periods of bureaucratic inaction" do not constitute deliberate indifference. R. 109 at 14. But Warden Pfister himself did not understand why the staff ignored Richard's December grievance about having been at NRC for more than six months. R. 110-2 at 16 (Pfister Dep. 60:8-61:21). And the assignment coordinator's email about Richard plausibly suggests that IDOC knew his prolonged stay was an issue and still failed to act. *See* R. 110-16 at 5 ("I seem to be the only one following up on MY emails with these ADA/Infirmary guys. My suggestion, again, is that you contact [Robinson] for placement. My stack keeps growing!"). These are facts from which a reasonable jury could conclude that Defendants' actions arose to the level of deliberate indifference. *See Biondo v. Kaledia Health*, 935 F.3d 68, 76 (2d Cir. 2019) (whether failure to provide plaintiff with an interpreter was due to "negligence or bureaucratic inaction" or deliberate indifference

9

was question for jury to decide). Accordingly, Defendants' motion for summary judgment on Richard's ADA and Rehabilitation Act claims is denied.[6]

## II. Eighth Amendment

Richard also brings a conditions of confinement claim under the Eighth Amendment. The Eighth Amendment prohibits punishments that "involve unnecessary and wanton infliction of pain, are grossly disproportionate to the severity of the crime for which an inmate was imprisoned, or are totally without penological justification." *Caldwell v. Miller*, 790 F.2d 589, 600 (7th Cir. 1986). For cases involving conditions of confinement, "two elements are required to establish a violation of the Eighth Amendment's prohibition against cruel and unusual punishment: first, an objective showing that the conditions are sufficiently serious— *i.e.,* that they deny the inmate 'the minimal civilized measure of life's necessities,' creating an excessive risk to the inmate's health and safety—and second, a subjective showing of defendant's culpable state of mind." *Isby v. Brown*, 856 F.3d 508, 521 (7th Cir. 2017) (internal citations omitted).

The "crux" of Richard's Eighth Amendment claim against Tejeda and Pfister is that "he was held in [NRC] for eleven months past his transfer date." R. 128 at 15. The parties agree that conditions at NRC are like those in disciplinary segregation.

---

[6] Defendants further argue that summary judgment should be granted on Richard's ADA and Rehabilitation Act claims because the IDOC has qualified immunity. Qualified immunity applies only to individual actors, not to state agencies or official-capacity suits, so this argument fails (indeed, claims under Title II of the ADA must be brought against a public entity). *Wagoner v. Lemmon*, 778 F.3d 586, 589-90 (7th Cir. 2015).

10

R. 132 ¶ 7. Richard points to several undesirable living conditions he experienced including that his cell was hot, lacked natural light and electrical outlets, was frequently visited by mice and birds, and would occasionally flood. *Id.* ¶¶ 4-5, 22-23. Richard also contends that he was confined to his cell 22-24 hours a day, only received replacement tubing for his oxygen tank once every two to three months, and was deprived of meaningful human contact. *Id.* ¶¶ 3, 21, 25, 51.

Based on Richard's response to Defendants' motion, however, it appears that his claim is based primarily on having "had no opportunities for exercise" during the eleven months he remained at NRC. R. 128 at 16; *see Isby*, 856 F.3d at 522 (while conditions of confinement may collectively establish an Eighth Amendment violation when each would not do so alone, this occurs "only when they have a mutually enforcing effect that produces deprivation of a single, identifiable human need such as food, warmth, or exercise."). Specifically, prison guards would not allow Richard to go to the recreation yard because they viewed his oxygen tank as a security threat, and because the NRC has no dayroom or library and Richard ate in his cell, he received almost no opportunity to move around at all.

"Lack of exercise may rise to a constitutional violation in extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened." *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996). There is no question that being denied exercise for 11 months is sufficiently serious to show Richard was deprived of a minimal necessity of life. *See Delaney v. DeTella*, 256 F.3d 679, 684 (7th Cir. 2001) (holding that inmate denied meaningful chance to exercise

11

for six months created viable Eighth Amendment claim). Defendants contend that Richard was permitted to use the recreation yard but chose not to because he would not leave his cell without his oxygen tank, and not permitting him to bring the tank to the yard was necessary to protect other inmates because it could be used as a weapon. To begin, even if not allowing Richard's oxygen tank in the yard served a legitimate penological interest, the Court is troubled that seemingly no alternatives for exercise were made available to him. *See id.* ("Here, both in duration and severity, the nature of [plaintiff's] alleged deprivation was significant and serious, and apparently no alternatives were made available to mitigate the effects of the deprivation.").

Defendants' argument also misses the point. Even if Richard had been permitted to use the yard, Tejeda testified that while he was at NRC inmates were allowed yard time once a week for two to three hours. R. 110-3 at 8 (Tejeda Dep. 29:1-6). The Seventh Circuit has previously upheld an injunction requiring that segregated inmates receive "at least five hours of exercise time per week in order to comply with the Eighth Amendment." *Davenport v. DeRobertis*, 844 F.2d 1310, 1315 (7th Cir. 1988). To be sure, five hours per week is not "always and everywhere" the constitutional minimum. *Id.* at 1316. Less exercise may suffice when the restriction is brief or when there are other mitigating circumstances. *See id.* at 1315-16; *Anderson v. Romero*, 72 F.3d 518, 527 (7th Cir. 1995) ("To deny a prisoner *all* opportunity for exercise outside his cell would, the cases suggest, violate the Eighth Amendment unless the prisoner posed an acute security risk if allowed out of his cell

for even a short time."). But there is zero evidence to suggest Richard posed a security or flight risk. *See Delaney*, 256 F.3d 684 ("Nor can the defendants argue that the 6-month denial was brought on by [plaintiff's] misconduct or propensity to escape."). And Richard remained at NRC under these conditions through no fault of his own; he could have received more time outside of his cell had he been transferred to a parent facility. *See Walker v. Shansky*, 28 F.3d 666, 673 (7th Cir. 1994) (whether conditions of confinement violate the Eighth Amendment depends in part on existence of feasible alternatives).

Defendants argue that even if Richard could not exercise, he has not shown he suffered a physical injury. But even putting aside the longer-term effects of insufficient exercise, *see French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985) ("[w]here movement is denied and muscles are allowed to atrophy, the health of the individual is threatened and the state's constitutional obligation is compromised"), Richard also suffered from depression and insomnia. R. 132 ¶¶ 27-28.[7] And the Seventh Circuit has expressly contemplated the "strong likelihood" of psychological injury when inmates are denied access to exercise for more than 90 days. *Delaney*, 256 F.3d at 685 (stating that "defendants also are wrong in concluding that only a showing of physical injury can satisfy an Eighth Amendment claim" and finding that mental injuries, along with attendant physical symptoms, were sufficiently severe to

---

[7] This is in addition to the multiple other injuries Richard claims to have suffered due to remaining in NRC including a respiratory infection, rash, sore throat, and bug bites. Richard further contends that his preexisting conditions were aggravated by the lack of exercise and fresh air. *Id.* ¶ 27.

13

show injury from an objectively serious deprivation). Accordingly, Richard has satisfied the objective component of the Eighth Amendment analysis.

Turning to the subjective component, Richard is required to prove that Defendants acted with a sufficiently culpable state of mind. *Id.* at 683 ("The subjective component [of a conditions of confinement claim] relates to a defendant's state of mind and requires a showing of deliberate indifference."). To satisfy this element, Richard must show "actual knowledge of impending harm easily preventable." *Id.* In determining whether prison officials had knowledge of the potential harm, courts consider whether "the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it[.]" *Id.* at 685 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

Richard argues that Defendants knew he "was subjected to the restrictive conditions of [NRC] for nearly one year" and yet failed to take steps to transfer him to a more appropriate facility. R. 128 at 18. After Tejeda spoke with Richard about transferring in early October 2015, he sent an email stating "let's see if we can get this offender out of [here]." R. 132 ¶ 32. The next day he sent a follow up email stating that the situation had been addressed. *Id.* ¶ 33. Meanwhile, Richard remained at NRC for an additional eight months. R. 126 ¶ 3. During that period, Tejeda received weekly reports stating that Richard had been at the NRC for over 90 days due to "ADA transport." R. 132 ¶ 31. The entire purpose of the 90-day list was "to stay on top of keeping people transferring out," and it was Tejeda's job to monitor it. R. 132 ¶¶ 37, 38. Despite seeing Richard's name on the 90-day list week after week, Tejeda

14

failed to send a single follow up email about his transfer. *Id.* ¶ 34. Meanwhile, Tejeda was aware of the segregation-like conditions at NRC, including the severe restrictions on inmates' out-of-cell and yard time. R. 110-3 at 8 (Tejeda Dep. 29:1-6). Despite speaking with Tejeda twice, filing grievances, and appearing on the 90-day list for months, Richard claims Tejeda did nothing. On these facts, a reasonable jury could conclude that Tejeda's inaction arose to the level of deliberate indifference.

Unlike Tejeda, Pfister never spoke with Richard. But the other considerations remain the same. Pfister knew that in some ways conditions at NRC were even more restrictive than in segregation. R. 110-2 at 8 (Pfister Dep. 27:17-19). He also knew in July 2015 that Richard had not been transferred because of his oxygen needs. R. 132 ¶ 17. In November 2015 (and continuing for months afterward), he began receiving the weekly 90-day transfer list with Richard's name. R. 132 ¶ 36. And Pfister's signature appears on the February 2016 response to Richard's December grievance. Although Pfister testified that a designee signed his name and he was unaware of Richard's grievance, R. 110-2 at 15-16 (Pfister Dep. 57:11-58:3), this testimony alone does not require summary judgment in his favor. *See Brown v. Carter*, 2017 WL 2362597, at *3 (N.D. Ill. May 31, 2017) (warden's deposition testimony regarding lack of knowledge of grievance "does not eliminate all dispute of fact regarding whether he knew about a grievance upon which his signature appeared."). Moreover, Pfister testified that he would normally call the transfer coordinator's office to follow up if he became aware an inmate was at NRC for more than six months, but did not recall doing anything to facilitate Richard's transfer here. R. 110-2 at 14 (Pfister Dep. 52:9-

15

53:2). Evaluating the record in the light most favorable to Richard, a material dispute exists over whether Pfister knew about his conditions of confinement and exhibited deliberate indifference.

Finally, Defendants argue that they are entitled to qualified immunity. "The doctrine of qualified immunity shields public officials from civil liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2017) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Clearly established" for purposes of qualified immunity means that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Delaney*, 256 F.3d at 686 (alteration in original) (quoting *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999)). Here, it is well established that prolonged confinement in segregation (the conditions of which Defendants admit resemble those at NRC) can violate the Eighth Amendment. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 666 (7th Cir. 2012) (citing *Walker*, 28 F.3d at 673); *see also Meriwether v. Faulkner*, 821 F.2d 408, 416 (7th Cir. 1987). And in 2001, the Seventh Circuit explained that "years before the [1996] lockdown at issue here was instituted, the case law clearly established that extended denials of exercise privileges raised constitutional concerns." *Delaney*, 256 F.3d at 686. That same unremarkable sentiment certainly holds true 19 years later. In light of the clearly established case law and information possessed by Defendants, reasonable officials could not have

16

believed that 11 months in segregation-like conditions with a complete denial of exercise was lawful. Defendants are thus not entitled to qualified immunity.[8]

## Conclusion

For the reasons stated, Defendants' motion for summary judgment, R. 108, is denied.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: September 1, 2020

---

[8] Defendants also raise the issue of exhaustion on Richard's Eighth Amendment claim but state that they "aren't arguing that Richard is foreclosed from complaining about not having . . . access to the yard," which presumably extends to a claim about his inability to exercise more generally. *See* R. 133 at 13. Accordingly, the Court need not consider the argument here. Defendants do not raise exhaustion as it relates to Richard's ADA and Rehabilitation Act claims.