UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WILLIAM RICHARD,

            Plaintiff,

      v.

WARDEN RANDY PFISTER, ET AL.,

            Defendants.

No. 17-cv-04677

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Plaintiff William Richard originally brought this action against Warden Randy Pfister, Assistant Warden Ricardo Tejeda, and then-Director of the Illinois Department of Corrections ("IDOC") John R. Baldwin for violations of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and the Eighth Amendment. Richard's Eighth Amendment claim was brought against Baldwin in his official and individual capacity. Sometime after Richard filed his complaint in 2017, Baldwin was replaced as the Director of IDOC by Rob Jeffreys. Accordingly, when Defendants moved for summary judgment in 2019, they substituted Baldwin as a party in this case with Jeffreys pursuant to Federal Rule of Civil Procedure 25(d), which provides for the substitution of a "public officer" sued in his "official capacity" who "ceases to hold office while the action is pending." *See* R. 109 at 1. However, as stated above, Richard's Eighth Amendment claim was brought against Baldwin in his official *and* individual capacity. So the question currently before the Court, and which the parties briefed, is whether summary judgment should be granted in favor of Baldwin on the

Eighth Amendment claim brought against him in his individual capacity. For the reasons that follow, the Court finds that it should not. Baldwin's motion for summary judgment is accordingly denied.

## Background

### A. Factual Allegations

Richard suffers from asthma, emphysema, diabetes, chronic obstructive pulmonary disease, and heart disease. R. 126 ¶¶ 22, 24. In June 2015, at 61 years old, he entered IDOC custody. R. 132 ¶ 11. At that time, Richard used an oxygen tank, continuous positive airway pressure (CPAP) machine, and cane or walker. R. 126 ¶ 23; R. 112 at 7-8.

Like many inmates entering IDOC custody, Richard first reported to the Northern Reception and Classification Center ("NRC"), which serves as an intake facility where inmates typically stay for one to two weeks before being transferred to a "parent facility" where they complete their term of incarceration. R. 132 ¶¶ 1, 11. Inmates are significantly more restricted at NRC than in general population settings at parent facilities. *Id.* ¶ 6. Among other things, NRC has no day room, gym, library, educational or vocational programs, or out-of-cell religious services. *Id.* Inmates eat meals in their cells, which lack natural light and electrical outlets, and in which they remain 22-24 hours a day. *Id.* ¶¶ 3-6. In many ways, conditions at NRC resemble those in disciplinary segregation. *Id.* ¶ 7.

Eight days after Richard arrived at NRC, he was approved to transfer to Western Correctional Center. R. 126 ¶ 27. When a correctional officer saw Richard's oxygen tank, however, he said it was not allowed on the regular transfer bus and Richard would have to wait to transfer. R. 132 ¶ 13. Just over a month later, NRC Superintendent Tracy Engleson contacted the IDOC Transfer Coordinator's Office about arranging a car transport for Richard. R. 126 ¶ 32. In early September, it was determined that Richard could be transferred by car and did not need an ADA van. R. 110-16 at 22. But for reasons that are not entirely clear, Richard remained at NRC. In an email regarding Richard, an assignment coordinator in the Transfer Coordinator's Office wrote that "I seem to be the only one following up on MY emails with these ADA/Infirmary guys. My suggestion, again, is that you contact [Robinson] for placement. My stack keeps growing!" *Id.* at 5.

Starting in October 2015, Assistant Warden Tejeda, who oversaw the NRC, began receiving weekly reports that Richard had been at the prison for over 90 days due to "ADA transport." R. 132 ¶ 31. On October 5, Richard told Tejeda directly about his situation and Tejeda said he would look into the issue. *Id.* ¶ 32. Tejeda then emailed Engleson stating "let's see if we can get this offender out of [here]." *Id.* The next day, Tejeda responded to an email from a different IDOC official about Richard that "[t]his has already been addressed. The NRC is waiting for Western IL to give us a date so we can meet them halfway so we can turn this offender over to them." R. 127-11 at 11.

3

By December, when Richard had still not been transferred, he submitted a grievance stating that he had "been in NRC for 6 months [waiting] on a bed space" in the infirmary unit at a parent facility. R. 132 ¶ 40; R. 127-14 at 1. After Richard did not receive a response, he filed a second grievance with identical language in February 2016. R. 132 ¶ 47. Two weeks later, a grievance officer responded to Richard's December grievance recommending "[n]o action as grievant appears to be receiving appropriate medical care at this time." R. 127-20. On April 7, 2016, Richard filed a third grievance listing his medical conditions, stating that he had "been in solitary confinement for ten months, 23 hours a day," had never gotten a CPAP machine, had gotten no exercise, and had been deprived of all meaningful human contact. R. 127-16 at 2-4. Richard also saw Tejeda again in April and told him that he had been bitten by bugs in his cell. R. 132 ¶ 53.

On April 8, Richard was reapproved for transfer (transfer approval lapses every 90-120 days) and assigned for placement in the infirmary at Dixon Correctional Center. R. 126 ¶¶ 47, 50. Richard was transported to Dixon by car on June 1, 2016. Id. ¶¶ 52, 56.

### B. Procedural History

As stated above, Richard brings claims for violations of the ADA, the Rehabilitation Act, and the Eighth Amendment. Defendants previously moved for summary judgment on all counts, which the Court denied on September 1, 2020. *See Richard v. Pfister*, 483 F. Supp. 3d 532 (N.D. Ill. 2020) (hereinafter, "the Order"). The Order stated that Jeffreys was automatically substituted for Baldwin pursuant to

Rule 25(d), and further noted that "[w]hile the second amended complaint states that [Richard] is also suing Baldwin in his individual capacity, his response to Defendants' motion for summary judgment does not mention Baldwin a single time." *Id*. at 535 n.1. The Court accordingly "assum[ed] any claim" against Baldwin had been "dropped." *Id*. At a status hearing nearly a year later, on June 2, 2021, Richard's counsel contended that this assumption was a mistake. The Court informed the parties that it would take another look at the filings and decide whether additional briefing would be needed as to Baldwin's status in the case.

The Court reviewed those filings, and determined that Richard's counsel was correct. That is, Baldwin was still a defendant because the Rule 25(d) substitution had worked to dismiss the Eighth Amendment claim filed against him in his official capacity but not in his individual capacity. And while it was still true that Richard's response to Defendants' motion for summary judgement did not mention Baldwin once, neither did Defendants' motion. Richard had no obligation to rebut arguments not made by Defendants.

Having found that Baldwin was still in the case, the Court granted defense counsel's request to file a supplemental brief to the original motion for summary judgment, this time focused solely on whether summary judgment is proper as to Baldwin. *See* R. 154. Briefing on the issue recently completed.

## Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.,* 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. Anderson v. *Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

## Analysis

As explained in the Order, Richard's Eighth Amendment claim challenges his conditions of confinement at NRC. The Eighth Amendment prohibits punishments that "involve unnecessary and wanton infliction of pain, are grossly disproportionate to the severity of the crime for which an inmate was imprisoned, or are totally without penological justification." *Caldwell v. Miller*, 790 F.2d 589, 600 (7th Cir. 1986). For cases involving conditions of confinement, "two elements are required to establish a violation of the Eighth Amendment's prohibition against cruel and unusual punishment: first, an objective showing that the conditions are sufficiently serious— *i.e.*, that they deny the inmate 'the minimal civilized measure of life's necessities,' creating an excessive risk to the inmate's health and safety—and second, a subjective

showing of defendant's culpable state of mind." *Isby v. Brown*, 856 F.3d 508, 521 (7th Cir. 2017) (internal citations omitted).

The Order found the objective element satisfied because Richard had been denied the opportunity to exercise during his 11 months at NRC. *Richard*, 483, F. Supp. 3d at 539-41. More specifically, the Order explained how prison guards would not allow Richard to go to the recreation yard because they viewed his oxygen tank as a security threat, and further explained how Richard received almost no other opportunity to move around because he ate his meals inside his cell and because NRC has no dayroom or library. *Id.* at 540. The Order also highlighted several undesirable living conditions Richard says he experienced while at NRC, including that his cell was hot, lacked natural light and electrical outlets, was frequently visited by mice and birds, and occasionally flooded. *Id.* at 539.

Baldwin does not challenge the Order's findings regarding the objective element of the Eighth Amendment analysis. Instead, Baldwin argues that he is entitled to summary judgment because the subjective element is lacking. According to Baldwin, there is no evidence in the record that would allow a reasonable juror to find that he had personal knowledge of the conditions of Richard's confinement. Baldwin points out that unlike Defendants Pfister and Tejada, there is no indication that he had face-to-face conversations with Richard; that he sent or received any e-mails concerning Richard; that he signed any grievance documents related to Richard; or that he spoke to a single person about Richard's situation.

7

Baldwin is correct that no direct evidence shows that he knew about the conditions giving rise to Richard's claim. *See Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004) (a plaintiff must show that the official "actually knew of" a dangerous condition and "consciously disregarded it nonetheless"). However, when a plaintiff challenges "systemic, as opposed to localized," conditions, a jury may infer that senior prison officials are aware of those conditions. *Antonelli v. Sheahan*, 81 F.3d 1422, 1429 (7th Cir. 1996); *see also Gray v. Hardy*, 826 F.3d 1000, 1008-09 (noting that the systemic-conditions principle applies at summary judgment). There is no bright-line test that determines when a condition is systemic rather than localized, but courts have found conditions to be systemic when they are "unlikely to affect only one inmate in isolation." *Britton v. Williams*, 2017 WL 4410117, at *4 (N.D. Ill. Oct. 4, 2017) (citations omitted). Examples of systemic prison conditions include inadequate nutrition, contaminated water, unsanitary living conditions, restrictions on library access, lack of recreation, extreme temperatures, and failing to make reasonable accommodations for obvious physical disabilities. *See Eason v. Pritzker*, 2020 WL 6781794, at *5 (N.D. Ill. Nov. 18, 2020) (collecting cases).

The denial of exercise that Richard experienced appears to be a systemic condition at NRC. Indeed, Richard was denied the opportunity to exercise in large part because of prison-wide restrictions on inmate movement. As Richard correctly notes, the prison's administrative guidelines—for which Baldwin was responsible as director—required prisoners, not just Richard, to remain confined to their cells nearly 24 hours per day. R. 160-1 at 3 (citing R. 127 at ¶ 3 and R. 127-9). All meals, law

8

library services, and religious programming occurred in cell, and showers were guaranteed only once per week. R. 127-9. Such restrictions prevented most inmates at NRC from any meaningful opportunity to move around, no less stretch their legs. *See French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985) ("Where movement is denied and muscles are allowed to atrophy, the health of the individual is threatened and the state's constitutional obligation is compromised."). Furthermore, while NRC's guidelines set out-of-cell recreation time to five hours per week, *see* R. 127-9, Defendant Tejeda testified that the actual amount of time many inmates were allowed in the yard was less—closer to two or three hours each week, *see* R. 110-3 at 8.[1] Thus, even if Baldwin did not know about Richard's 11-month stay at NRC, a jury could infer that Baldwin knew that prisoners at the facility were unlikely to be afforded adequate opportunities to exercise due to the significant limitations placed on their movement, and that physical or mental harm could result. *See Gray*, 826 F.3d at 1009 (jury could infer that warden knew about systemic conditions at prison because the risk of harm from those conditions was "obvious"); *Delaney v. DeTella*, 256 F.3d 679, 685 (7th Cir. 2001) (acknowledging the "strong likelihood" of psychological harm when segregated prisoners are denied access to exercise for more than 90 days).

---

[1] "**Q**: How does that compare to NRC? **A**. The NRC is a little different. They will have yard time on the weekend. This was when I was there. **Q**. Right. **A**. I don't know if it's changed. **Q**. Just speaking when you were there. **A**. Okay. So, yeah, they will be out in the yard for maybe, two, three hours. **Q**. Once a week or twice a week? **A**. It was once a week, depending what gallery you are on." Tejeda Dep. 29:1-6.

Baldwin resists this conclusion. He points out that prisoners at NRC typically stay for just one or two weeks, *see* R. 132 ¶ 1, and contends that prolonged incarceration is not a widespread problem at the facility, *see* R. 163 at 1-2. This argument would suggest that the denial of exercise is not a systemic condition at NRC because most prisoners leave before a constitutional violation arises. *See Antonelli*, 81 F.3d at 1432 (lack of exercise may become a constitutional violation in "extreme and prolonged situations"). But there is record evidence indicating that many prisoners have stayed at NRC for much longer than two weeks. Indeed, NRC staff maintained weekly reports of all inmates who spent 90 days or more at the prison and were not on the transfer list. *See* R. 127-10. According to those reports, as many as 122 inmates stayed at NRC for at least 90 days before being transferred to their parent facility. *Id.* at 59. And several of the inmates, like Richard, were not transferred earlier because officials determined that an ADA transport vehicle was needed to leave the prison. *Id.* at 3, 8. Thus, it is certainly not the case that Richard's prolonged visit at NRC was unique to him.[2] Nor does it require a stretch of the imagination to think that those who experienced prolonged stays at NRC were denied adequate opportunities to exercise, since, as explained above, the facility's restrictions on movement applied to most inmates, not just Richard. *Cf. Perkins v. Williams*, 2018 WL 453743, at *4 (N.D. Ill. Jan. 17, 2018) (denying summary

---

[2] Spending 90 days or more at NRC is not the same as the 11 months that Richard endured, but even Defendant Tejada testified that it would be "fair" to characterize 90 days at NRC as a "long time". *See* R. 110-3 at 24 (Tejeda Dep. 90:5-11).

judgment against senior prison officials, and finding that conditions were systemic because they were set by prison policy).

It is not lost on the Court that unlike the other defendants in this case, Baldwin was not the direct supervisor in charge of operations at NRC. As the former Director of IDOC, Baldwin was presumably a step or two removed from managing the day-to-day issues at the facility, focusing his attention instead on the entire state prison system. But that does not mean that a jury could not infer that he knew about the conditions involved in Richard's claim. As the Seventh Circuit has explained, a high-ranking officer such as Baldwin "can be expected to have personal responsibility" for "systemic violations" that affect many prisoners. *Antonelli*, 81 F.3d at 1429. On this basis, courts have denied summary judgment motions filed by directors. *See, e.g.*, *Silva v. Pfister*, 2021 WL 1103483, at *7 (N.D. Ill. Mar. 23, 2021). For the reasons stated above, this Court does the same.

## Conclusion

Baldwin's motion for summary judgment, R. 158, is denied. Trial is set to begin July 26, 2021.

ENTERED:

_Thomas M Durkin_

_____
Honorable Thomas M. Durkin
United States District Judge

Dated:  July 16, 2021

11